560 P.2d 861

Robert W. COMPTON,
Plaintiff-Appellant,

v.

Martha R. Compton GILMORE,
Defendant-Respondent.

No. 12058.

Supreme Court of Idaho.

Feb. 25, 1977.

Robert S. Williams, Moscow, for plaintiff-appellant.

Allen V. Bowles, Moscow, for defendant-respondent.

BISTLINE, Justice.

This appeal raises a challenge to an order modifying a final divorce decree whereby a father was enjoined from providing religious training to his five year old daughter. We reverse that order.

Robert and Martha Compton were married in October, 1961, and have one child, Kari, born on April 22, 1969. Robert (plaintiff-appellant) was granted a default divorce in December of 1971, with the court awarding custody of Kari to her mother, Martha, and, as also requested, "50% visitation rights" to her father, Robert.

In October of 1972, Martha (defendant-respondent) moved for a modification, alleging difficulties in interpreting the "50%" language. A hearing was held two weeks later; and the decree was modified leaving custody in Martha, with Robert's visitation set at three weekends and one midweek visitation per month.

In the following month, November of 1972, Martha, without consulting Robert, made the decision that it was in Kari's best interest for Kari to live with Robert, who was by then married to Marilyn; Kari then lived with Robert and Marilyn with Martha having such visitation as she deemed proper. All of the foregoing was accomplished without asking for any court guidance or approval.

In the spring of 1974, however, Martha made a new decision; this was that Kari would be better off living with her; in August of 1974 Kari was later returned to Martha. Meanwhile, Martha has been living with Todd Gilmore.

On November 6, 1974, Martha (not yet Gilmore) filed a new motion seeking to cut Robert's visitation down to one 30-hour weekend per month, and one summer month, primarily alleging her belief that it would be better for Kari if Robert's visitations were confined to what she thought had been reasonable when she had been the visiting parent. Eight days after the filing, Todd and Martha culminated their two-year courtship with a marriage ceremony. A hearing on Martha's motions followed three weeks after her marriage to Todd Gilmore. An order was entered on February 10, 1975 (amended on March 19, 1975), limiting Robert's visitation to the one weekend per month, six weeks in the summer, and alternating holidays.

Two months later Robert filed his motion claiming a material change in circumstances due to his imminent move to Boise. He requested extended holiday and visitation rights, this to be in lieu of his one-a-month weekend visits. Martha filed an opposing affidavit in which she alleged that conduct on Robert's part tended to undermine her relation with Kari. She contended that

Kari was "receiving input from plaintiff (Robert) which results in her becoming temporarily antagonistic toward defendant (Martha) and causing Kari to question defendant's basic goodness." This affidavit goes on to say that such was evidenced by, among other things, a remark of little Kari: "You and Todd (Mr. Gilmore) are walking away from God."

Robert's motion was heard in July of 1975, and an order entered on August 2, 1975, in which his future visitation and phone call rights were spelled out in the minutest detail. The order specified that each party "refrain from ever speaking to Kari about the other parent in a derogatory manner."

Robert was also ordered to "refrain from providing formal religious training for Kari Compton," and the entry of such order he assigns as error, challenging it as in violation of his (and Kari's) right to freedom of speech and of religion as provided in both the United States and Idaho Constitutions. Robert argues that the restraining order is too vague and ambiguous to be understood, much less to be enforced by a contempt citation, and thus a violation of his right to due process of law.

Martha argues that, by statute, the court is empowered to address all issues relating to the child's care and welfare, I.C. § 32–705; she contends that Robert's constitutional right to freedom of speech and religion is outweighed when it comes in conflict with the State's interest in the welfare of the child. She argues further that the court order is not constitutionally vague since its meaning, construed in light of the whole record, is clear. She argues that:

> "The Court's order requires the appellant to restrict the meetings that Kari Compton is taken to and to restrain the significance which appellant places on the religious aspects of his home life while Kari Compton is present."

We find no need to reach such lofty constitutional questions. The record is uncontradicted that prior to the hearing in December of 1974, Martha had never complained, or even intimated to Robert that his reli-

gious guidance of Kari was creating a problem of any kind. Religion went entirely unmentioned by the court either in oral remarks on the conclusion of testimony or in the order emanating from that hearing.

In her affidavit opposing Robert's request for better summer and holiday visitation rights, Martha was quick to assure the court that "the additional time Kari has spent at home since December 10, 1974, has helped eliminate the confusion as to who are authority figures in her life." Kari's supposed "guilt" feelings and her supposed "bizarre" behavior after visits with her father were by Martha attributed to the very fact that there were such visits, and also to Robert's supposed indiscreet discussion of parental conflicts—but never as to religious indoctrination on his part. In their pleadings, neither party made any issue regarding the other's role in Kari's upbringing, religious, as to Robert, or nonreligious, as to Martha.

At the July, 1975, hearing virtually all testimony on the topic of religion was elicited by the court, and this only after the court overruled an objection by Robert's counsel when Martha's counsel touched upon it in examining her. As between the parties, the testimony showed that there had been only one communication on the subject. Thereafter, according to Robert's uncontradicted testimony, "she (Martha) has not made any other effort to interfere with my relationship with my child as far as religion goes."

Early in this hearing, the court announced:

"So that I don't forget what * I am going to do in this final order, I am going to order you now to refrain from that kind of religious training of the child when * she is with you."

Robert immediately inquired, "Could you be explicit on that?" and the court replied, "I will be." However, during concluding remarks, the court said only: "You're going to have to cool it a bit about religion when she is with you . . .. I can't be more specific than that."

Various recommendations regarding religious training were then made to both parents, but the court remarked, "that is not an order. It is just a recommendation to you." And the court explicitly stated:

"I can't tell you not to take her to church . . .. I don't feel it would be right to order you not to go to church when she is in your home."

█ The bench expressions of the trial court were proper and wholly in accord with the salutary general rule applicable to this type of situation, which we observe to have been well stated by the Washington Supreme Court as follows:

"Thus the rule appears to be well established that the court should maintain an attitude of strict impartiality between religions and should not disqualify any applicant for custody or restrain any person having custody or visitation rights from taking the children to a particular church, except where there is a clear and affirmative showing that the conflicting religious beliefs affect the general welfare of the child. . . . Where the trial court does not follow the generally established rule of noninterference in religious matters in child custody cases without an affirmative showing of compelling reasons for such action, we are of the opinion that this is tantamount to a manifest abuse of discretion." *Munoz v. Munoz*, 79 Wash.2d 810, 489 P.2d 1133, 1135 (1971).

Here, there had been no such "affirmative showing that the conflicting religious beliefs affect the general welfare of the child." Indeed, the court's sole relevant finding of fact was that the child exhibited "strange," "unusual" and "aggressive behavior" after visits with her father. No finding was made that such behavior was in any way *caused by the religious differences* of the parents.

Nor would this record support a finding of any "compelling reasons" to justify an exception to the general rule of noninterference. Such reasons typically are found only in situations where "there is a serious danger to the life or health of a child as a result of the religious views of a parent."

*Stapley v. Stapley*, 15 Ariz.App. 64, 485 P.2d 1181, 1187 (1971).

Had the trial court not delegated his fact-finding processes to counsel, it is doubted that the order under challenge and necessitating this appeal would have been entered. Clearly the trial court, in his bench remarks, expressed a different view after first stating such an order would be entered.

Some trial judges make their own findings and conclusions, but others delegate that duty. We call attention of bench and bar alike to a statement we recently made:

"IRCP 52(a) requires the judge in all actions tried upon the facts without a jury to 'find the facts specially and state separately [his] conclusions of law thereon and direct the entry of the appropriate judgment'." *In re Estate of Stibor*, 96 Idaho 162, 163, 525 P.2d 357, 358 (1974).

Therein we quoted approvingly from the Supreme Court of New Mexico in *Mora v. Martinez*, 80 N.M. 88, 451 P.2d 992, 993–4 (1969):

" '[We] take note of the fact that, although our Rule 52 differs from the federal rule, nevertheless the reasons for both rules are the same, i. e., as an aid to the appellate court by placing before it the basis of the decision of the trial court; *to require care on the part of the trial judge in his consideration and adjudication of the facts* ; and for the purposes of res judicata and estoppel by judgment. [Citing Barron & Holtzoff and Moore.]' " (Emphasis added.) *In re Estate of Stibor*, 96 Idaho at 163–64, 525 P.2d 357 at 358.

The New Mexico court in *Mora* continued on from the above passage with the following:

"We agree with the federal cases which, without exception, require adequate findings and insist on *the exercise of an independent judgment on the part of the trial judge in making his own findings of fact rather than adopting those of one of the parties.* See, among others, *Edward Valves, Inc. v. Cameron Iron Works, Inc.,*

289 F.2d 355 (5th Cir. 1961); and *United States v. Forness*, 125 F.2d 928, 942 (2d Cir. 1942); as well as *Featherstone v. Barash,* 345 F.2d 246, 249 (10th Cir. 1965), where the court aptly stated:

'Proper and adequate findings of fact are not only mandatory, but highly practical and salutory in the administration of justice. It has been pointed out that the trial court is a most important agency of the judicial branch of the government precisely because on it rests the responsibility of ascertaining the facts. The Supreme Court recently underscored the responsibility of the court with respect to findings, and was critical of any indiscriminate dependence upon counsel in formulating them. (Citing *United States v. El Paso Natural Gas Co., et al.,* 376 U.S. 651, 84 S.Ct. 1044, 12 L.Ed.2d 12 (1964)). Whatever difficulties there may be under various circumstances in the application of the 'clearly erroneous' rule in support of the trial court's findings, these difficulties are immeasurably compounded by dubious findings. And when findings wholly fail to resolve in any meaningful way the basic issues of fact in dispute, they become clearly insufficient to permit the reviewing court to decide the case at all, except to remand it for proper findings by the trial court.' " (Emphasis added.) *Mora v. Martinez*, 451 P.2d at 994.

In *United States v. El Paso Natural Gas Company*, 376 U.S. 651, 84 S.Ct. 1044, 12 L.Ed.2d 12 (1964), the United States Supreme Court was faced with 130 findings of fact and one conclusion of law which had been drafted by the winning counsel and adopted verbatim by the district court. The Supreme Court voiced its dissatisfaction with this practice, quoting approvingly from the advice given by Judge J. Skelly Wright in his "Seminars for Newly Appointed United States District Judges":

"Who shall prepare the findings? Rule 52 says the court shall prepare the findings. 'The court shall find the facts specially and state separately its conclusions

of law.' We all know what has happened. Many courts simply decide the case in favor of the plaintiff or the defendant, have him prepare the findings of fact and conclusions of law and sign them. This has been denounced by every court of appeals save one. This is an abandonment of the duty and the trust that has been placed in the judge by these rules. It is a noncompliance with Rule 52 specifically and it betrays the primary purpose of Rule 52—the primary purpose being that the preparation of these findings by the judge shall assist in the adjudication of the lawsuit.

"I suggest to you strongly that you avoid as far as you possibly can simply signing what some lawyer puts under your nose. These lawyers, and properly so, in their zeal and advocacy and their enthusiasm are going to state the case for their side in these findings as strongly as they possibly can. When these findings get to the courts of appeals they won't be worth the paper they are written on as far as assisting the court of appeals in determining why the judge decided the case." 376 U.S. at 656, 84 S.Ct. at 1047, n. 4.

The point is not so much that winning counsel will be tempted to overreach. Rather, the practice undermines the entire judicial function itself. The point was made most clearly by Judge Maris, speaking for the Third Circuit:

"Obviously the judge must have dealt with the questions of fact and law involved in the case in the course of the reasoning by which he has reached his ultimate conclusion, even though his reasoning has not been articulated and put on paper. But counsel who is called upon to articulate and write out the findings and conclusions must do so without any knowledge of the fact findings and reasoning processes through which the judge has actually gone in reaching his decision.

"We strongly disapprove this practice. For it not only imposes a well-nigh impossible task upon counsel but also flies in the face of the spirit and purpose, if not the letter, of rule 52(a). The purpose of that rule is to require the trial judge to formulate and articulate his findings of fact and conclusions of law in the course of his consideration and determination of the case and as a part of his decision making process, so that he himself may be satisfied that he has dealt fully and properly with all the issues in the case before he decides it and so that the parties involved and this court on appeal may be fully informed as to the bases of his decision when it is made. *Findings and conclusions prepared ex post facto by counsel, even though signed by the judge, do not serve adequately the function contemplated by the rule.* At most they provide the judge with an opportunity to reconsider the bases of his original decision but without affording the parties any information as to what those bases were or which of them are being reconsidered. At worst they are likely to convict the judge of error because, as here, they are inadequate to support his decision or because, as we have observed in other cases, they are loaded down with argumentative overdetailed partisan matter much of which is likely to be of doubtful validity or even wholly without support in the record." (Emphasis added.) *Roberts v. Ross,* 344 F.2d 747, 751–52 (3d Cir. 1965).

All of this is not to say that a trial court may not avail itself of assistance of counsel.

"The trial court may invite counsel to submit proposed findings and conclusions of law. Indeed this practice 'is well established as a valuable aid to decision making.' Counsel have an obligation to aid the court by responding to such an invitation. Particularly in complex cases, involving technical or scientific issues, the proposed findings may help the court to avoid error.

"If the court plans to have the assistance of counsel with regard to the findings, the better practice is to request proposed findings prior to decision and to make the request of counsel for both sides. In this way each party may present findings setting forth his theories and the evidence that he thinks supports those theories.

The court may select the findings that are correct and reject those that are wrong. They may be restated in other language. The court is not required to rule specifically on the requests in making its own findings. Proposed findings submitted by counsel are no more than informal suggestions for the assistance of the court. Indeed it is said in some cases that only those findings actually made by the court are part of the record on appeal, though it may well be doubted whether this is in fact the rule." 9 Wright & Miller, Federal Practice & Procedure, § 2578 at 702–04 (1971).

We hold that the order of August 8, 1975, insofar as it ordered Robert Compton to refrain from providing formal religious training for Kari Compton was erroneously and improvidently entered. On the matter of visitation, where one of the parents is required to live at some distance from the residence of the custodial parent, see *Dawson v. Dawson*, 90 Idaho 234, 409 P.2d 434 (1965). The visitation rights afforded Robert by the court, while not raised directly by an Assignment of Error, do not appear to reflect any abuse of judicial discretion.

Order modifying final decree reversed and remanded with directions to strike from the said Order of August 2, 1975, that portion which states: "That plaintiff shall refrain from providing formal religious training for Kari Compton." In other respects affirmed. Costs to appellant.

McFADDEN, C. J., and DONALDSON, SHEPARD and BAKES, JJ., concur.