DIANE CAROL PALMER FELTON *vs.* WAYNE FRASER FELTON.

Hampden.   December 2, 1980. — March 31, 1981.

Present: HENNESSEY, C.J., BRAUCHER, KAPLAN, WILKINS, & ABRAMS, JJ.

*Divorce*, Custody of child, Modification of judgment.

In a proceeding seeking modification of the visitation provisions of a divorce judgment, there was insufficient evidence as to deleterious emotional or physical effects on the children or an undermining of the mother's custodial relationship with them by reason of the father's religious instruction or practice to support a judgment forbidding visitation unless the father refrained from instructing the children in his religion. [233-241]

LIBEL for divorce filed in the Probate Court for the county of Hampden on January 5, 1977.

A complaint for contempt and a complaint seeking modification of the judgment of divorce were consolidated for trial and heard by *Placzek,* J.

After review was sought in the Appeals Court, the Supreme Judicial Court, on its own initiative, ordered direct appellate review.

*Alan M. Katz* for the defendant.

*Guy R. Peznola* for the plaintiff.

KAPLAN, J.  Here is the case in outline.  After divorce, custody of the two minor children of the marriage was granted to the mother, with visitation rights to the father. The mother, a member of a Congregational church, later complained that the father, who had become a Jehovah's Witness, was indoctrinating the children in that faith, and that this confused and disoriented the children and in some degree alienated them from her.  A judge of the Probate Court entered judgment modifying the visitation provisions of the divorce judgment in effect to forbid visitation unless

the father refrained from instructing the children in his religion. The father appealed, and we transferred the case here on our own motion for direct review. Holding that the evidence brought forward was not sufficient to support the judge's disposition, we reverse the judgment and remand for further proceedings (if the mother should elect) at which the facts, including particularly those bearing on the physical and emotional consequences to the children, may be more fully developed.

1. The question whether or how to accommodate diverse religious practices of parents, living apart, in the upbringing of minor children, is a not unfamiliar one in State courts, but has not had much attention here. Typical is the approach taken in a recent case, *In re Marriage of Murga,* 103 Cal. App. 3d 498, 504-505 (1980): "[T]he courts have refused to restrain the noncustodial parent from exposing the minor child to his or her religious beliefs and practices, absent a clear, affirmative showing that these religious activities will be harmful to the child. [Citations omitted.] The refusal to intervene in the absence of a showing of harm to the child reflects the protected nature of religious activities and expressions of belief, as well as the proscription against preferring one religion over another. [Citations omitted.]"

To enlarge on this. The parents together have freedom of religious expression and practice which enters into their liberty to manage the familial relationships. See *Custody of a Minor,* 375 Mass. 733, 747-748 (1978); *Wisconsin* v. *Yoder,* 406 U.S. 205 (1972); *Pierce* v. *Society of Sisters,* 268 U.S. 510 (1925); Developments in the Law — The Constitution and the Family, 93 Harv. L. Rev. 1156, 1161-1168 (1980). But the "best interests" of the child are to be promoted, and when the parents are at odds, the attainment of that purpose may involve some limitation of the liberties of one or other of the parents. See *Miller* v. *Hedrick,* 158 Cal. App. 2d 281, 285 (1958); *Morris* v. *Morris,* 271 Pa. Super. 19, 29 (1979). Cf. *Vilakazi* v. *Maxie,* 371 Mass. 406, 409 (1976); *Prince* v. *Massachusetts,* 321 U.S. 158, 166-167 (1944). However, harm to the child from conflicting reli-

gious instructions or practices, which would justify such a limitation, should not be simply assumed or surmised; it must be demonstrated in detail. See *Lewis* v. *Lewis,* 260 Ark. 691, 693 (1976); *Compton* v. *Gilmore,* 98 Idaho 190, 192 (1977); *Pope* v. *Pope,* 267 S.W.2d 340, 343 (Mo. App. 1954); *Goodman* v. *Goodman,* 180 Neb. 83, 88-89 (1966); *Munoz* v. *Munoz,* 79 Wash. 2d 810, 813 (1971). But cf. *Boerger* v. *Boerger,* 26 N.J. Super. 90, 104 (1953).

If the dominating goal of the enterprise is to serve a child's best interests, as the cases asseverate (see *Vilakazi* v. *Maxie, supra* at 409; cf. G. L. c. 208, § 31 [as to awards of custody]), then it might be thought to follow that a policy of stability or repose should be adopted by which the child would be exposed to but one religion (presumably that of the custodial parent) at whatever cost to the "liberties" of the other parent.[1] The law, however, tolerates and even encourages up to a point the child's exposure to the religious influences of both parents although they are divided in their faiths. This, we think, is because the law sees a value in "frequent and continuing contact" of the child with both its parents (*Murga, supra,* 103 Cal. App. 3d at 503, quoting from Cal. Civ. Code § 4600 [West 1981]) and thus contact with the parents' separate religious preferences.[2] There

---

[1] Indeed there are situations where even the joint wishes of the parents are disregarded by the courts in order to avert threatened or real harm to the child. See *Custody of a Minor,* 375 Mass. 733, 747 & n.8 (collecting cases) (1978).

[2] The parties in the present case do not challenge this or other policies underlying the current doctrines described in text, which in turn rest on common psychologic beliefs.

See J. Goldstein, A. Freud, & A. Solnit, Beyond the Best Interests of the Child 38, 116-133 (2d ed. 1979), for support of the idea that in case of difference between divorced parents as to upbringing of their children, the custodial parent should have virtually full command, including denial of visitation to the other. But see *Seneca* v. *Seneca,* 94 Misc. 2d 418, 419-420 (N.Y. Fam. Ct. 1978); *Pierce* v. *Yerkovich,* 80 Misc. 2d 613 (N.Y. Fam. Ct. 1974); *Gardebring* v. *Rizzo,* 269 N.W.2d 104, 107-110 (N.D. 1978). J. Goldstein, et al., *supra* at 113-133, respond to the *Pierce* case and a review of the first edition of their book by Dembitz, 83 Yale L.J. 1304, 1310-1311 (1974).

may also be a value in letting the child see, even at an early age, the religious models between which it is likely to be led to choose in later life. And it is suggested, sometimes, that a diversity of religious experience is itself a sound stimulant for a child. See *Smith* v. *Smith*, 90 Ariz. 190, 194 (1961) (en banc). In all events, the question that comes to the courts is whether, in particular circumstances, such exposures are disturbing a child to its substantial injury, physical or emotional, and will have a like harmful tendency for the future. See Mnookin, Child Custody Adjudication: Judicial Functions in the Face of Indeterminacy, 39 L. & Contemp. Prob. 226, 251-252 (No. 3, 1975). The critical literature warns against perverting a quest for the child's best interests into one for the psychic comfort of the parents — a warning against overvaluing the parents' constitutional liberties. See Henszey, Visitation by a Non-Custodial Parent: What Is the "Best Interest" Doctrine?, 15 J. Fam. L. 213 (1976-1977). Cf. *Quiner* v. *Quiner*, 59 Cal. Rptr. 503, 519-520 (Ct. App. 1967) (Herndon, J., dissenting). A warning is equally in order against depriving a parent of all connection with the child, or connection on the religious plane, out of an exaggerated fear of injury to the child. See Note, The Religious Upbringing of Children After Divorce, 56 Notre Dame Law. 160, 171 (1980); Developments in the Law, *supra*, 93 Harv. L. Rev. at 1340. It is often said that if accommodation appears necessary, that form should be sought which intrudes least on the religious inclinations of either parent and is yet compatible with the health of the child.[3]

2. The parents at bar, Diane and Wayne Felton, were married in September, 1967, at the respective ages of twen-

---

[3] This last point is developed in *Osier* v. *Osier*, 410 A.2d 1027 (Me. 1980), a case on original award of custody in the face of a claim that the religious practices of one of the parents would endanger the child. The problems in that field of course resemble closely those arising where visitation rights once granted are sought to be limited on the same account; characteristic of such original custody situations are *Clift* v. *Clift*, 346 So. 2d 429, 434-435 (Civ. App. Ala. 1977); *Bonjour* v. *Bonjour*, 592 P.2d 1233 (Alas. 1979); *Waites* v. *Waites*, 567 S.W.2d 326 (Mo. 1978). Cf. *Smith* v. *Smith*, 90 Ariz. 190 (1961) (en banc); *Levitsky* v. *Levitsky*, 231 Md. 388 (1963); *Harris* v. *Harris*, 343 So. 2d 762 (Miss. 1977).

ty and twenty-three. Deborah was born to them in March, 1971, and Jennifer in May, 1974. Wayne began to live apart from the family in April, 1976, on an informal arrangement that left custody with Diane and allowed liberal visitation to Wayne. The divorce judgment nisi of June 1, 1977, continued custody and visitation on a similar agreed basis.[4] The orientation of the family had been Protestant, and what religious experience or training the children received was at the Foster Memorial Church (Congregational) in Springfield.

Sometime in summer or fall, 1976, soon after the separation, Wayne became interested in the Jehovah's Witnesses, which on this record may be described as a Protestant sect of fundamentalist doctrine with strict attachment to the Biblical texts.[5] By the time the divorce judgment became absolute in December, 1977, Wayne was committed to these precepts, a commitment probably strengthened by his marriage to Gail, a Jehovah's Witness, in the same month. It was not until May, 1978, however, that he took the step of being baptized as a Witness.

According to Diane's later testimony, she knew of Wayne's new religious interest around the time of the separation. In the last months of 1977 she became apprehensive of the effect on the children of the religious instruction imparted to them by their father during the periods of visitation. She remonstrated with Wayne about this in October or November, 1977. There was an abortive effort, about mid-March, 1978, for the two to meet to discuss the matter. When, on April 8, 1978, Wayne and Gail, on a visitation day, took the children to a lengthy "family" convention of Jehovah's Witnesses, Diane decided to take a firm

---

[4] Wayne's visitation rights appear in the agreement thus: "a. Between 9:00 A.M. and 5:00 P.M. b. Alternate Saturdays and Sundays c. One week-end per month d. One week during the year, both children for vacation e. Holidays and birthdays on an alternate basis."

[5] We hew to the record, which might not accord with a theologian's description. No point has been made in this case of ideas about blood transfusion or flag salute associated with the Witnesses.

stand and refused to allow further visitation, permitting Wayne only weekly telephone conversations with the children. On April 28, 1978, Wayne commenced contempt proceedings against Diane, in response to which Diane sought a change of the visitation part of the divorce judgment. Following a pretrial conference, the probate judge on January 11, 1979, made an interim order suspending Wayne's visitation rights. An evidential hearing took place on January 30, 1979, resulting in dismissal of the contempt application and entry of judgment the same day:[6] "[S]aid defendant [Wayne Felton] shall hereafter have the right to visit and to take Deborah Jean Felton and Jennifer Lynn Felton, minor children of said parties, at reasonable times, provided that he refrains from giving his children any religious training or education which shall be in conflict or contrary with the religious training and beliefs of the custodial parent." This on its face would require subtle interpretation and raise infinite difficulties of enforcement, but the intent in substance was to forbid religious instruction of the children by Wayne or his involving them in religious practice.[7]

The hearing had rambled through many pages of transcript.[8] When the mere chatter or banter is put aside, we find a relatively small bundle of relevant material. From Diane's testimony it appeared that she disliked what she took to be Jehovah's Witnesses' doctrine and style, and her negative feelings were probably communicated to the then seven-year old Deborah (Jennifer at age four hardly figured). What especially concerned Diane was that the Witnesses did not celebrate birthdays, Christmas included,

---

[6] There was an unfortunate delay in the review of this case because of a mixup in the defendant's perfection of the appeal in the Appeals Court.

[7] Thus the judge said Wayne was not to read Bible with the children or take them to church services (or even cite to them the Ten Commandments).

A further provision of the judgment of January 30, 1979, is mentioned at n.12 below.

[8] A few acrimonious exchanges, some aimless discussion of church doctrine, and a number of lengthy interjections by the judge might better have been avoided.

and regarded Halloween and Santa Claus as atavisms to be shunned. So also the Witnesses were negative with respect to the Easter Bunny and the Tooth Fairy. Diane thought Wayne should not be impairing Deborah's enjoyment of birthdays and holidays or puncturing her fantasies — there would be time for disillusionment as she grew up. Diane at the family home celebrated birthdays and carried on in the other conventional ways with the children. Their upbringing on Diane's side was not intensely religious but was Congregational as far as it went, with attendance at Sunday school and Bible reading there. In Diane's view, the Bible reading on Wayne's side (about the exact nature of which neither she nor Wayne actually testified in detail) was too strict or literal and not suited to young children. She thought it detracted from Wayne's "knowing" the children. Similarly attendance from morning to afternoon at the April 8 convention (described only sketchily in the testimony) in her estimation was wrong for children. Deborah, Diane said, was upset and confused; this was largely through reluctance to recount to her mother what happened during visits with her father, presumably because she sensed her mother's disapproval of that régime.

So much for Diane's testimony. Wayne in his testimony verified that the doctrine of his church forbade birthday celebrations and so forth and bound him to instruct the children in his religion with its emphasis on strict reading of, and implicit belief in Biblical text. He held that those who deviated from this text and the direct derivations from it were "wrong," but he did not depreciate or lessen them on account of such errors. It was not true that the children's visits consisted only of Bible lessons and other religious instruction: the children were entertained by being taken to the movies on occasion, by games played with Gail's young sons, and other diversions. Deborah did not seem to Wayne to be upset, and there was love between his daughters and himself (this seemed conceded by Diane).[9]

---

[9] There was also brief testimony by Gail Felton. She sought to picture Diane as balefully influencing the children and deliberately turning them

3. We apply the words of *Schuler* v. *Schuler*, 382 Mass. 366, 368 (1981), a case seeking modification of alimony and child support provisions in a divorce judgment, to the present case, also demanding modification of a divorce judgment, although as to a different subject matter: "To be successful in an action to modify a judgment for alimony or child support, the petitioner must demonstrate a material change of circumstances since the entry of the earlier judgment. *Robbins* v. *Robbins*, 343 Mass. 247, 249 (1961). *Hinds* v. *Hinds*, 329 Mass. 190, 191-192 (1952). In this case, the judge held that [the petitioning husband] did not prove the requisite change of circumstances. The judge reported his findings and we have a transcript of all the evidence. Accordingly, 'the appeal brings before us all questions of law, fact, and discretion.' *Krokyn* v. *Krokyn*, 378 Mass. 206, 208 (1979), quoting from *Cohen* v. *Murphy*, 368 Mass. 144, 147 (1975). However, we will not reverse findings made by the judge on the basis of oral testimony unless we are convinced they are plainly wrong. *Consent to Adoption of a Minor*, 363 Mass. 537, 539 (1973). *Whitney* v. *Whitney*, 325 Mass. 28, 28-29 (1949)."

We have noted the meagerness of the evidence on such elementary points as the precise manner of Wayne's Bible lessons. The more striking weakness is a failure of proof about Deborah's physical and emotional condition or about any causal connections between her visits with her father and that condition, such as it may have been. General testimony by Diane that the child was upset or confused (and that testimony was contradicted by testimony of like generality on the part of Wayne) will not suffice. See *Compton* v. *Gilmore, supra,* 98 Idaho at 191-192; *Goodman* v. *Goodman, supra,* 180 Neb. at 88-89; *Munoz* v. *Munoz, supra,* 79

---

against their father. Gail said that when Deborah told her on April 8 that she feared telling her mother that she was at the convention, she, Gail, indicated that Deborah need not report this when she got home. Gail's testimony merely adds to the difficulty on the present record of making a satisfactory estimate of the children's state of mind.

Wash. 2d at 814; *Robertson* v. *Robertson,* 19 Wash. App. 425, 427-428 (1978). There are few ground-level facts to be found in the record on this entire matter. The decisions hold such an infirmity to be fatal to an action seeking to limit materially or to cancel visitation rights. See *Compton, supra* at 192; *Munoz, supra* at 814; *Pope* v. *Pope, supra,* 267 S.W.2d at 343; *Angel* v. *Angel,* 2 Ohio Op. 2d 136, 138 (C.P. 1956). Cf. *Smith* v. *Smith, supra,* 90 Ariz. at 194; *Osier* v. *Osier,* 410 A.2d 1027, 1031 (Me. 1980). Thus there is clear error, for lack of foundation in the record, in the judge's findings of a "deleterious effect" on the children and an "undermining" of the custodial relationship by reason of the father's religious instruction or practice. The findings seem traceable to a predisposition on the judge's part. His remarks during the hearing would indicate that, despite some protestations by him to the contrary, he assumed that differences of religion, at least where one of the parents took his religion zealously, must have such grave damaging effect on the children as to require the censorship he imposed by the judgment. The assumption is far from self-proving. "We are not convinced . . . that duality of religious beliefs, per se, creates a conflict upon young minds." *Munoz, supra* at 815. See also *Lewis* v. *Lewis, supra,* 260 Ark. at 693.

We conclude the discussion of the inadequacy of the record to base the judgment by referring to a pair of cases comparable to the present. A trial judge in *Robertson* v. *Robertson, supra,* had forbidden the father, a Jehovah's Witness, to discuss his beliefs with his children during visitation. This order was grounded on the custodial mother's affidavit that the father's teachings "confuse and alarm [the] children" and "have a detrimental and confusing impact upon [their] welfare." *Id.* at 427. Pointed to specifically was the father's teaching about holidays which, according to the mother, "causes a great deal of trauma for the children at school because they feel guilty." *Id.* In reversing the order and remanding for further proceedings, the appellate court said the case called for a "*factual* showing, not mere conclusions and speculation" (court's emphasis). *Id.*

In *In re Marriage of Murga, supra,* 103 Cal. App. 3d 498 (1980), the custodial mother sought to condition the father's visitations with a nine-year old son on the father's engaging in only such religious teaching or activity as the mother approved. The father, who evidently was adhering to one of the less popular Protestant sects, had prayed and studied Bible with his son daily during visitations and taken him to services and Sunday school. These exercises, the mother asserted, resulted in the boy's hating religion and refusing to go to church with her. She claimed the boy had fits of temper just before visitations. But there was testimony by the father that any such displays disappeared when the boy was out of the mother's presence. The mother's requested change of the visitation provisions of the divorce decree was denied on the trial as well as the appellate level, again for failure of evidence persuasive of a connection between such problems as the child might have and his involvement in religious activities during visitations.[10] The few cases which, though faithful to the accepted legal pattern earlier described, limit visitation because of religious differences, have relied on firmer proof.[11]

4. Upon the reversal of the judgment of modification appealed from (which will have the effect of restoring the original judgment) and remand of the case to the Probate Court, Diane may, if so advised, again apply for modifica-

---

[10] The father allowed to stand and did not appeal from a provision of the order, otherwise favorable to him, forbidding him to discuss religion with the boy during their weekly telephone conversations.

[11] In *Morris* v. *Morris,* 271 Pa. Super. 19 (1979), the court forbade the father, a Jehovah's Witness, to take a young child with him on door-to-door canvasses during visitation periods (but did not impose any other restriction). There had been testimony by a child psychologist that this activity would be harmful.

In *Vilakazi* v. *Maxie,* 371 Mass. 406 (1976), custody was awarded to the father (for reasons unconnected with religion) and visitation altogether denied the mother. The case reached us on findings without a transcript, so review was of narrow scope. Under the findings, psychological harm to the child from the mother's teaching of great hostility toward white people ("They are devils") had to be taken as proved.

tion upon additional and updated evidence. A suggestion of the kind of proof that might be influential on either side, and the likely sources of such proof, appears by implication in *Pope* v. *Pope, supra,* 267 S.W.2d at 343, where, upon reversing an order restricting visitation on account of religious differences, the court said the custodial mother "gave no testimony whatever that his [child's] general demeanor, attitude, school work, appetite, health or outlook has been affected one iota by the so-called conflict in his mind. Her testimony was wholly uncorroborated. No church, school, medical or psychiatric authorities, nor any of the boy's associates, in or out of school, appeared in support of this charge." We should mention, too, that a judge may seek correction of the possibly self-serving testimonies of the father and mother by appointing a qualified investigator (whether called a guardian or given some other title) who would look into the facts, render a report, and be subject to examination by the parties. See *Gilmore* v. *Gilmore,* 369 Mass. 598, 603-606 (1976); *Jones* v. *Jones,* 349 Mass. 259, 264-265 (1965); G. L. c. 215, § 56A.[12]

Some two years will have elapsed between the judgment appealed from and the coming down of this opinion. We do not know how circumstances may have changed in the meanwhile. It will be for the probate judge to consider upon competent proof whether some order adjusting the visitation provisions of the original judgment would be advisable during an interim period, pending the result of any further hearings that may be in prospect on the mother's application. Cf. *Osier* v. *Osier, supra,* 410 A.2d at 1032.

*Judgment reversed.*

---

[12] The judgment to be reversed stated that "upon request of either of said parties, said visitations shall be monitored" by a named probation officer. What was intended is unclear, but the provision seems to look to assuring enforcement of the judgment rather than to call for investigation that might lead to the court's approving a changed régime.