**Marilyn Verjohn HANSON, Plaintiff and Appellee,**

v.

**James L. HANSON, Defendant and Appellant.**

**Civ. No. 11235.**

Supreme Court of North Dakota.

April 16, 1987.

Judith A. Atkinson, Bismarck, for plaintiff and appellee.

Rauleigh D. Robinson, Bismarck, for defendant and appellant.

GIERKE, Justice.

James L. Hanson appeals from a district court judgment which granted a divorce to Marilyn Verjohn Hanson. James challenges the trial court's distribution of marital property and debt, awards of spousal support and child support, and placement of restrictions on his visitation rights. We affirm the property distribution and awards of spousal and child support, but reverse the visitation restrictions.

James and Marilyn were married on January 2, 1964. The three sons born of the marriage were 21, 17, and 11 years of age on the date of trial. Marilyn had her diploma as a registered nurse when the parties married and, during the early years of the marriage, she provided the primary financial support for the family while James earned college degrees in pharmacy and bacteriology. James became licensed as a pharmacist in 1970.

During the mid–1970s, the parties moved to Elgin, where James was employed as administrator of the hospital. Marilyn obtained employment in Elgin as a teacher for the Southwest Vocational Mobile Program. James lost his job at the hospital in 1981. After being unemployed for six months, James moved to Center and opened a pharmacy. Marilyn remained in Elgin with the children, and James would return on weekends. James and Marilyn were members of the Roman Catholic Church while in Elgin and the children were raised as Catholics. After opening the pharmacy in Center, James became a member of the Pentecostal Apostolic Church.

James testified that while he worked in Center and the family remained in Elgin, he paid $1,250 per month in support to cover the house payment and other bills. However, in February 1985, James stopped making the payments. According to James, Marilyn told him she did not want him around anymore, "[a]nd upon being rejected, I just lost motivation in regards to supporting." Marilyn was unable to continue making the house payments, so the family moved and rented a home. Marilyn later withdrew $7,000 from her teacher's retirement fund to pay the family bills. Marilyn subsequently commenced this divorce action.

During the divorce trial in January 1986, James testified that his present earnings in Center amounted to $700 per month. Marilyn testified that she is presently employed as a care supervisor at the hospital in Elgin and earns $487 every two weeks. Her monthly expenses are approximately $1,200.

The district court essentially awarded each party the personal property in their possession. Marilyn's award totaled $9,760 and James' award totaled $9,084. Marilyn was required to assume $1,277.44 of the couple's debt, leaving her a total of $8,482.56 for a property settlement. James was required to assume $11,451.92 of the debt, leaving him a negative $2,367.92 for a property settlement. James was also awarded the assets and liabilities of his business, but the court found that the liabilities outweighed the assets. James was also ordered to pay spousal support in the sum of $10,000 "either at the time [Marilyn] enrolls in the college of her choice or three years after the Entry of Judgment in this case, whichever comes first in time." The court granted custody of the two minor children to Marilyn and ordered James to pay $300 per month child support "until the youngest child graduates from high school." The court granted James visitation rights, but ordered that "[d]uring any of the visitation by [James], [James] is prohibited from taking the children to any church or church services other than the church to which the children belong."

James' major assertion on appeal is that the trial court erred in prohibiting him during visitation periods from taking the children to his church or church services.

Pursuant to § 14–05–22(1), N.D. C.C., the court in a divorce case "may give such direction for the custody, care, and education of the children of the marriage as may seem necessary or proper, ..." The statute further requires the court, after making an award of custody and upon request of the noncustodial parent, to "grant such rights of visitation as will enable the child and the noncustodial parent to maintain a parent-child relationship that will be beneficial to the child, unless the court finds, after a hearing, that visitation is likely to endanger the child's physical or emotional health." § 14–05–22(2), N.D. C.C. A trial court's determination on visitation will not be overturned on appeal unless it is clearly erroneous. *Persons v. Persons,* 396 N.W.2d 744, 745 (N.D.1986).

Few areas of dispute in child custody and visitation cases are more fraught with difficulty than those involving differences in the religious beliefs of the divorced parents. Although we have not spoken directly on the issue,[1] most courts that have considered the question have refused to restrain a noncustodial parent during visitation periods from exposing the minor child to his or her religious beliefs and practices, absent a clear, affirmative showing that these religious activities will be harmful to the child. *See, e.g., In re Marriage of Mentry,* 142 Cal.App.3d 260, 190 Cal.Rptr. 843 (1983); *In re Marriage of Murga,* 103 Cal.App.3d 498, 163 Cal.Rptr. 79 (1980); *Compton v. Gilmore,* 98 Idaho 190, 560 P.2d 861 (1977); *Felton v. Felton,* 383 Mass. 232, 418 N.E.2d 606 (1981); *In re Marriage of Heriford,* 586 S.W.2d 769 (Mo. Ct.App.1979); *Munoz v. Munoz,* 79 Wash.2d 810, 489 P.2d 1133 (1971); *Robertson v. Robertson,* 19 Wash.App. 425, 575 P.2d 1092 (1978); Annot., 22 A.L.R.4th 971, § 14 (1983); Note, *The Religious Upbringing of Children After Divorce,* 56 Notre Dame Law. 160 (1980). It further appears that, absent a showing of emotional or physical harm to the children, courts will not impose upon the noncustodial parent the affirmative obligation of policing during visitation periods the religious instructions of the custodial parent. *See Brown v. Szakal,* 212 N.J.Super. 136, 514 A.2d 81 (1986); *cf. Fisher v. Fisher,* 118 Mich.App. 227, 324 N.W.2d 582 (1982) [court refused to order custodial parent to continue Christian training to which noncustodial parent wished the children exposed]. The typical rationale relied upon by the courts for this rule is aptly summarized in *Munoz, supra,* 79 Wash.2d at 812–814, 489 P.2d at 1135:

> "The courts are reluctant ... to interfere with the religious faith and training of children where the conflicting religious preferences of the parents are in no way detrimental to the welfare of the child. The obvious reason for such a policy of impartiality regarding religious beliefs is that, constitutionally, American courts are forbidden from interfering with religious freedoms or to take steps preferring one religion over another. (Citations omitted.)

> \* \* \* \* \* \*

> "Thus, the rule appears to be well established that the courts should maintain an attitude of strict impartiality between religions and should not disqualify any applicant for custody or restrain any person having custody or visitation rights from taking the children to a particular church, except where there is a clear and affirmative showing that the conflicting religious beliefs affect the general welfare of the child.

> "We recognize the general rule that in child custody cases the trial court, in furtherance of the best interests and welfare of the child, is vested with a wide latitude of discretion and in the absence of a manifest abuse of discretion in awarding the custody and control of minor children, its judgment will not be disturbed on appeal.... However, where the trial court does not follow the generally established rule of noninterfer-

---

1. In *Guldeman v. Heller,* 151 N.W.2d 436, 441 (N.D.1967), this court, upholding a grant of child custody to the natural father on a motion to modify, noted as one of several factors supporting the trial court's decision that the child's stepfather was "of a different religious background." It does not appear, however, that the issue whether the child should be raised in one religion as opposed to another was present in the case.

ence in religious matters in child custody cases without an affirmative showing of compelling reasons for such action, we are of the opinion that this is tantamount to a manifest abuse of discretion."

To justify the placement of religious restrictions on visitation rights, the physical or emotional harm to the child resulting from the conflicting religious instructions or practices cannot be simply assumed or surmised, but must be demonstrated in detail. For example, the court in *Felton, supra,* reversed a judgment modifying the visitation provisions of a divorce decree to forbid visitation unless the father, a Jehovah's Witness, refrained from instructing the children in his religion. The mother, a member of the Congregational Church, complained that the father was indoctrinating the children in his faith and that this confused and disoriented the children and alienated them from her. The court concluded that the custodial parent's general testimony that the child was "upset" or "confused" was insufficient to support the trial court's findings of a " 'deleterious effect' on the children and an 'undermining' of the custodial relationship by reason of the father's religious instruction or practice." *Felton, supra,* 383 Mass. at 240, 418 N.E.2d at 610.

Similarly, in *Robertson, supra,* the court reversed an order prohibiting a noncustodial father from taking his two sons to any meetings of the Jehovah's Witnesses and from teaching or expressing to them certain religious doctrines during visitation periods. The court concluded that the mother's affidavit stating that the teachings of the Jehovah's Witnesses " 'confuse and alarm [the] children' and 'have a detrimental and confusing impact upon [their] welfare' and that the specific precept of nonobservance of holidays 'causes a great deal of trauma for the children at school because they feel guilty ...' " was insufficient to support a showing that the conflicting religious beliefs affected the general welfare of the children. *Robertson, supra,* 19 Wash.App. at 427, 575 P.2d at 1093. Likewise, in *Munoz, supra,* where the custodial parent was a member of the Mormon Church, the court reversed an order prohib-

iting the noncustodial parent from taking the children to any Catholic Church services or to any instructional classes sponsored by the Catholic Church. The court stated that the record merely showed "speculation on the part of the parents that it was 'confusing' to the 6–year-old son" and that this evidence was insufficient to support a finding that exposure to two religious beliefs had any adverse effect upon the children. *Munoz, supra,* 79 Wash.2d at 814, 489 P.2d at 1135. The court noted that "[w]e are not convinced, in absence of evidence to the contrary, that duality of religious beliefs, per se, creates a conflict upon young minds." *Munoz, supra,* 79 Wash.2d at 815, 489 P.2d at 1136.

In this case, the evidence of physical or emotional harm to the children from the parents' disparate religious beliefs and practices resembles that presented and rejected in *Felton, Robertson,* and *Munoz.* The trial court's order is based upon the following findings:

"6. That the religion of the family has been that of Roman Catholic, but recently the father-defendant has changed church attendance to a different church. The father has at times attempted to press his new faith upon the children, thus causing them stress. That for the defendant to continue this course of action may cause damage to the relationship of him to his children. The children presently actively practice their religion."

James testified that since becoming a member of the Pentecostal Apostolic Church, he has become "excited about the Lord" and now reads the Bible more often than he used to, sometimes with the children. He testified that his sons recognize the change in their father and that this is "disturbing" to them. Marilyn testified that the boys do not like to visit with James because "he has been telling them they are not religious," that "the Catholic church believes in cannibalism," and that "the Catholic church and Lutheran church taught false doctrine." She further testified that the boys are being "pulled back and forth" because of the conflict in their

parents' religious beliefs and that this "upsets" them. While we recognize the trial court's concern that James' attempts "to press his new faith upon the children" could possibly strain their relationship, the evidence in this case falls short of the clear and affirmative showing of physical or emotional harm to the children required to justify the religious restrictions placed upon James' visitation rights.[2] We conclude that the trial court's order prohibiting James from taking the children during visitation periods to any church other than the Catholic Church is clearly erroneous and, accordingly, that part of the judgment is reversed.

■ James also challenges the trial court's awards of spousal support and child support, and its distribution of the property and debts of the parties. A trial court's findings on matters of property division, spousal support, and child support will not be set aside on appeal unless they are clearly erroneous. Rule 52(a), N.D.R.

Civ.P.; *Kraft v. Kraft,* 366 N.W.2d 450, 453 (N.D.1985).

The trial court ordered that James pay to Marilyn as spousal support a lump sum of $10,000 "either at the time the plaintiff enrolls in the college of her choice or three years after the Entry of Judgment in this case, whichever comes first in time." Marilyn was a registered nurse before the parties were married and the trial court found that she provided the primary support for the family while James obtained two college degrees. The court further found that during their marriage the parties had agreed that if Marilyn helped James obtain his degrees he would help her obtain her four-year college degree. Although the court recognized that the state now requires registered nurses to have a four-year degree and that Marilyn had been "grandfathered in and will retain her RN status," the court found that Marilyn nevertheless "has exceptional need for spousal support to help her attain the college degree in connection with her reg-

---

2. In cases where religious restrictions placed upon visitation rights have been upheld, the evidence of physical or emotional harm to the child has been more substantial. *See Funk v. Ossman,* 150 Ariz. 578, 724 P.2d 1247 (Ct.App. 1986) [where custodial parent was Lutheran lay minister, order enjoining noncustodial parent from taking eight-year-old child to formal Jewish religious training or indoctrination upheld; evidence included testimony of three psychologists, one of whom testified that child had anxiety problem caused by differences in the religions which manifested itself in encopresis]; *Andros v. Andros,* 396 N.W.2d 917 (Minn.Ct.App. 1986) [where custodial parent was Lutheran, order prohibiting noncustodial parent from taking eight and ten year-old children to Assemblies of God Church upheld; evidence included testimony of psychologist who testified that further exposure of the children to religious hostilities between their parents would likely cause emotional damage in the future, and testimony of the children that they were "a little afraid" of the events at the noncustodial parent's church meetings]; *Morris v. Morris,* 271 Pa.Super. 19, 412 A.2d 139 (1979) [where custodial parent was Roman Catholic, order prohibiting noncustodial parent from taking four-year-old child on any Jehovah's Witnesses door-to-door solicitations upheld; evidence included testimony of clinical psychologist who testified that the door-to-door solicitations would probably result in some psychological impairment and mental disorientation to the child].

We do not intimate that expert medical or psychological testimony is required to sustain the showing of physical or emotional harm to the child resulting from the parents' conflicting religious beliefs. However, general testimony of a parent, as in this case, that the children are "confused" or "upset" by the duality of their parents' religious beliefs does not suffice. *See Felton v. Felton,* 383 Mass. 232, 418 N.E.2d 606, 610 (1981).

The dissent states that our above characterization of the evidence pertaining to physical or emotional harm to the children "demeans" the actual testimony in this case. The dissent relies in part on Marilyn's testimony that James had been telling the children that he "no longer believes in the Catholic church," that "the Catholic church believes in cannibalism," and that "the Catholic church and Lutheran church taught false doctrine." The dissent also relies on Marilyn's testimony that "Bradley was embarrassed" by a telephone call James made to him at school. We note that the "children" in this case were 21, 17 and 11 years of age at the time of trial, but were not called to testify. Presumably, the boys were competent to testify as to the effect James' comments and actions had on them. *See Andros, supra.* In addition, the school officials who apparently witnessed the telephone conversation could have been called to testify about Bradley's reaction to the call.

istered nurses' certification," and that "she can only obtain this means of future support for herself and the children if she completes her schooling."

■ We have stated that permanent spousal support may be awarded in an attempt to provide maintenance for a spouse incapable of rehabilitation. *Rustand v. Rustand,* 379 N.W.2d 806, 807 (N.D.1986). Rehabilitative spousal support is awarded to provide an opportunity for a disadvantaged spouse to seek education, training, or experience that will enable the spouse to become self-supporting. *Rustand, supra.* James asserts that the award cannot be justified as permanent spousal support because Marilyn, as a fully-employed registered nurse, is thus not incapable of rehabilitation. He asserts that the award cannot be justified as rehabilitative spousal support because Marilyn is already capable of supporting herself and even if she were to obtain her four-year nursing degree, it would only be "a matter of pride" to her since her earnings would likely remain the same. He also asserts that, although Marilyn expressed a desire during trial to continue her education, the award is not actually dependent upon her obtaining any further education because she may opt to simply wait three years to receive it.

■ While the award of spousal support under these circumstances may not fall precisely within the technical definitions of either permanent or rehabilitative spousal support, we do not believe this is fatal to the award. In awarding spousal support, a court may properly recognize a spouse's role in contributing to the other spouse's earning capacity which was developed and enhanced during the course of the marriage. *Weir v. Weir,* 374 N.W.2d 858, 864 (N.D.1985). The determinative factor is the sufficiency of income to permit each party to maintain apart the standard of living enjoyed together. *Bagan v. Bagan,* 382 N.W.2d 645, 646 (N.D.1986). Substan-

tial marital assets do not exist in this case. However, the parties were married for 22 years and, as evidenced by James' past income and employment, his earning ability is substantially greater than that of Marilyn. Marilyn aided James in obtaining his greater earning capacity by providing the primary financial support for the family while James attended college. In view of these circumstances, we conclude that the trial court did not err in awarding the spousal support.

■ James also asserts that because he presently earns only $700 per month, he is and will be financially unable to pay the $10,000 spousal support award. In awarding spousal support, the trial court must take into consideration the supporting spouse's needs and ability to pay. *Routledge v. Routledge,* 377 N.W.2d 542, 545 (N.D.1985). The record reflects that through February 1985 James was paying $1,250 per month to the family for support and that he owed the Internal Revenue Service approximately $6,500 for 1984 taxes. James' past income and employment history thus demonstrate that he has the earning capacity to meet the spousal support obligation. The court found that James' present income varied because of the economic conditions in Center and the nature of his business.[3] James stated during the trial, and the court considered, that he would be selling the business and possibly working for a pharmaceutical company in the near future. This would presumably place him in a better financial situation. The court further found that James had the ability and earning power to pay the debts of the family, but apparently delayed the payment of spousal support because of his present financial difficulties. In view of James' earning capacity as demonstrated by his past income and employment, his stated plans to sell the business and seek more lucrative employment, and his ability to seek modification of the judgment under

---

**3.** The court did not find that James had deliberately depressed his income in contemplation of the divorce action. We note that a spouse may not voluntarily place himself in a position which does not allow him to comply with the support provisions of a divorce decree, or vol-

untarily remain in such a position where the record indicates that he could find employment which would enable him to meet his support obligations. *See generally Perry v. Perry,* 382 N.W.2d 628, 630 (N.D.1986); *Gross v. Gross,* 53 N.D. 480, 485–486, 206 N.W. 793, 795 (1925).

§ 14–05–24, N.D.C.C., if he is unable to meet the spousal support obligation when it becomes due, we cannot say that the trial court's award of $10,000 to be paid when Marilyn enters college or three years from the date of judgment is clearly erroneous. *See Whedon v. Whedon,* 58 N.C.App. 524, 527–528, 294 S.E.2d 29, 30–31 (1982).

■ We also conclude that the trial court's order that James pay $300 per month in child support is not clearly erroneous. James testified that he could afford to pay $200 per month in child support and that, at the time of trial, he was sending $100 per month to his son who was attending college.

■ Although James asserts that the property distribution is clearly erroneous because he was required to assume more of the marital debt than Marilyn, we have often stated that there is no requirement that a property division in a divorce case be equal in order to be equitable. *E.g., Williams v. Williams,* 302 N.W.2d 754, 757 (N.D.1981). Approximately $3,000 of the debt allocated to James was for a camper he was awarded. Approximately $4,000 of the property awarded to Marilyn consisted of the remainder of her teacher's retirement fund she had to withdraw to support the family after James discontinued providing support in February 1985. Under the circumstances, we conclude that the property distribution is not clearly erroneous.

In accordance with this opinion, the provision of the divorce judgment prohibiting James from taking the children during visitation periods to any church other than the Catholic Church is reversed. The judgment is otherwise affirmed. Marilyn's request for costs and attorney fees pursuant to Rule 38, N.D.R.App.P., is denied.

ERICKSTAD, C.J., and MESCHKE and LEVINE, JJ., concur.

VANDE WALLE, Justice, concurring in part and dissenting in part.

I dissent insofar as the majority opinion reverses the visitation restrictions.

We are not here merely concerned with a situation in which the custodial parent does not wish the children exposed to religious practices different from those of the custodial parent. Many of the cases cited in the majority opinion concern exactly that situation. For example, in *Munoz v. Munoz,* 79 Wash.2d 810, 489 P.2d 1133 (1971), the trial court determined it would be detrimental to the children to have them exposed to conflicting religious beliefs and concluded that the best interests of the children would be served by having them raised in the religious beliefs of the parent having custody and therefore prohibited the noncustodial parent from taking the children with him to church when the children were visiting him. The only affirmative evidence of detriment to the children, according to the decision, was the speculation by the parents that the 6–year-old child showed confusion when asked why he attended two churches. So, too, in *Robertson v. Robertson,* 19 Wash. App. 425, 575 P.2d 1092 (1978), the only evidence of detriment to the children was confusion caused by attending two churches.

In *Felton v. Felton,* 383 Mass. 232, 418 N.E.2d 606 (1981), there was no evidence of detriment, other than confusion, to the children and the noncustodial parent who took the children to a church different from that in which they were being raised did not depreciate or lessen the children because of their religious beliefs although he believed the religion was in error. Nor is this case similar to that of *Szakal v. Szakal,* 212 N.J.Super. 136, 514 A.2d 81 (1986), in which the New Jersey Court refused to require the noncustodial parent, when the children were with him, to enforce the dietary and other religious practices of the custodial parent.

Although the majority contends that it does not intimate that expert medical or psychological testimony is required to sustain the showing of physical or emotional harm to the children resulting from the parents' conflicting religious beliefs, it demeans the testimony in this case as "general testimony of a parent, ... that the children are 'confused' or 'upset' by the duality of their parents' religious beliefs ..." I do not agree that this accurately characterizes

the testimony of the parties or the actual holding of the trial court.

Here, the mother testified:

"Now he has been telling them he no longer believes in the Catholic church, the Catholic church believes in cannibalism. Chris and one of his friends were up there for awhile this year, and this other boy had told his mother too that the Catholic church and Lutheran church taught false doctrine."

She further testified in response to a question of whether the father appeared to be motivated by his religious teachings as follows:

"I think so. Everything is based on that. I understand that he called the school last Monday and talked to Bradley, called him out of class and told him that he was just upset, he wasn't believing in Jesus Christ, and all that stuff. It upsets the boys, and they do practice religion. Bradley was embarrassed. The secretary was there, superintendent and principal. He thought they could hear everything he was saying to him."

Finally, in response as to whether or not he had ever had any reaction from the boys as to his new religious views, the father testified that there had been some reaction, that there had been some standoffishness.

Thus, contrary to what most of the cases cited in the majority opinion reflect, and what we might expect, i.e., that the restriction placed upon the religious practices by the trial court was solely for the purpose of protecting the children from emotional trauma, here the restriction was intended to preserve the father-son relationship. Thus the trial court found:

"That the religion of the family has been that of Roman Catholic, but recently the father-defendant has changed church attendance to a different church. The father has at times attempted to press his new faith upon the children, thus causing them stress. That for the defendant to continue this course of action may cause damage to the relationship of him to his children. The children presently actively practice their religion."

The trial judge, in his opinion delivered from the bench, stated in his findings: "Now, because of the concerns that we've all voiced and that the children have, in deed [*sic*], voiced, and the fact that this religious conflict between the parents disturbs the children, and the fact that they are in a divorce situation and something like that is even more aggravated, and the fact that I feel this religious dispute will eventually destroy the father and child relationship if it's allowed to go unchecked, …"

We have said more times than should be necessary that we will reverse a finding by the trial court only if it is clearly erroneous and that a finding is clearly erroneous only when, although there is some evidence to support it, the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been made. Despite our pious platitudes that we do not substitute our judgment for that of the trial court, that the issue is not whether we would have reached the same decision, and that the trier of fact is the judge of the credibility of the witnesses and the weight to be given to their testimony, there is in these cases, which are admittedly difficult, a continuing pattern, intentional or otherwise, in which we, as an appellate court, do just that. But it is particularly in this type of case, where the trial court has had the opportunity to observe the parents, listen to their testimony, and judge their credibility not only as witnesses but as parents, that we should be the most reluctant to substitute our judgment for that of the trial court. Employing these standards of review, I cannot conclude that the findings of the trial court were clearly erroneous with respect to the restrictions on visitation.

This case is similar to one which the majority cites but attempts to distinguish, *Andros v. Andros*, 396 N.W.2d 917 (Minn. App.1986), in which the Minnesota Appellate Court affirmed the decision of the trial court which scheduled visitation with the noncustodial parent to preclude him from taking the children to his church. The Minnesota court, in rejecting the appel-

lant's contention that the modification of visitation violated his constitutional rights, stated at page 924 of the reported opinion:

"Appellant urges the court to apply a 'compelling state interest' standard to the modification of visitation where controversy centers around the children's religious upbringing. We decline to do so. The court's modification of visitation affects neither appellant's religious beliefs, nor his right to practice his religion. The court's ruling simply repeats the law, a legal custodian has the right to determine the minor children's religious training.

"We hold that the court's decision does not affect appellant's constitutional right to freedom of religion. Although appellant's wish to involve the children in his religious activities is now subject to respondent's consent while they are minors, appellant is, and always has been, free to practice his religious beliefs as he sees fit."

I would affirm the entire judgment.