642 P.2d 64

**Paul E. PLINE, Plaintiff-Respondent,**

v.

**ASGROW SEED COMPANY, a corporation, Defendant-Appellant.**

No. 13848.

Court of Appeals of Idaho.

March 9, 1982.

James B. Lynch of Imhoff & Lynch, Boise, for defendant-appellant.

Robert M. Tyler, Jr. of Elam, Burke, Evans, Boyd & Koontz, Boise, for plaintiff-respondent.

SWANSTROM, Judge.

In 1975 the parties entered into two contracts whereby Paul E. Pline agreed to grow "Commander" seed corn for Asgrow Seed Company. After Pline grew the corn it was delivered to Asgrow and processed for seed purposes, but Asgrow rejected most of the seed, claiming it failed to meet Asgrow's germination standards and was "unfit for seedmen's use."

The payment Asgrow offered for the seed was unacceptable to Pline, and he brought suit. The trial court found Pline's seed crops met Asgrow's germination standards and Asgrow had breached the contract. The court awarded judgment to Pline for the full amount he claimed due. Asgrow has appealed and has assigned numerous errors by the trial court in admitting evidence and in making its findings and conclusions.

There were two contracts signed by Pline and Asgrow, each covering a separate tract of land farmed by Pline, one of eleven acres and one of seventeen acres. The contracts were otherwise identical. Each contract consisted of a printed "ASGROW SEED COMPANY BAILMENT CONTRACT TO GROW SEED" form supplied by Asgrow and a "ASGROW SEED COMPANY BAILMENT CONTRACT RIDER" which was drafted by one of Asgrow's employees.

Asgrow supplied the seed stock that Pline planted and grew in 1975. The crop was harvested on October 29 and 30, and delivered to Asgrow. After drying and milling, Asgrow netted 18,095 pounds of seed from the seventeen acre tract and 13,935 pounds from the eleven acre tract. Asgrow refused to pay Pline the full contract price for these crops contending that they were damaged before harvest by an early freeze.

Asgrow contends that due to the pre-harvest freeze the harvested seed did not meet Asgrow's "normally accepted standard" of germination for seedmen's use; and therefore, under paragraphs fifteen[1] and sixteen[2] of the contracts, Asgrow was not obligated to pay the full contract price.

At trial Asgrow claimed that its "normally accepted standard" of germination was 85%. This 85% germination standard was not set forth in the contracts; nor was it communicated to Pline by Asgrow prior to execution of the contracts. Pline, who was an experienced grower of sweet corn, had never previously contracted with Asgrow to grow corn for seed purposes.

Paragraph fifteen of each contract stated that "Asgrow may designate the crop or any part thereof as unfit for seedmen's use if the germination of the crop or part thereof is less than the Asgrow normally accepted standard..." if Asgrow submitted a "properly drawn and representative sample" of the crop to "any official federal and/or state testing laboratory" within sixty days after receipt of the seed for germination testing. Asgrow did not submit such samples to a testing laboratory in this case.

Asgrow conducted its own germination tests, and submitted evidence at trial that the seed germinated at levels ranging from 68% to 85% with only a small portion of the crops germinating at the 85% level. Pline submitted evidence that the seed germinated at the level of 91% for one crop and 94% for the other. The trial court found that the crops germinated at the level of 91% and 94% and concluded that Asgrow breached its contracts with Pline by rejecting the seed.

Arguably, the trial court simply could have found Asgrow breached the contracts by not submitting the samples to an independent laboratory for testing as required by the contracts; that, based upon such breach, Asgrow was precluded from claiming the seed failed to meet "Asgrow's normally accepted standard." However, the trial judge did not take this course.

The trial judge instead determined that "Asgrow's normally accepted standard," "unfit for seedmen's use," and other terms used in the contract were ambiguous. He therefore permitted extrinsic evidence to come into the trial to explain what meaning should be given to those terms. He also admitted evidence to establish what germination level met industry standards for "merchantability" and for "seedmen's use". Conflicting evidence was received from Pline and Asgrow bearing upon the germinating ability of the seed produced by Pline. From this array of contested and conflicting evidence the trial court ultimately

---

1. "15. Upon or after physical delivery Asgrow may designate the crop or any part thereof as unfit for seedmen's use if the germination of the crop or part thereof is less than the Asgrow normally accepted standard for the variety as determined by any official Federal and/or State Testing Laboratory by a test of a properly drawn and representative sample thereof, said sample being drawn and submitted by Asgrow within sixty days after receipt of the seed, or if the seeds comprising the crop or such part thereof contain more than twelve percent (12%) of moisture, or if in the judgment of Asgrow, the crop or such part thereof is in any other respect unfit for seedmen's use and cannot be made fit without an unreasonable amount of cleaning or sorting."

2. "16. If Grower shall violate the provisions of paragraphs 6, 7, 8, or 10, or if Asgrow shall designate the crop or any part thereof as unfit for seedmen's use under paragraph 15 Asgrow shall not be required to compensate Grower for satisfactory services under paragraph 5, but may instead at its option either (a) assign the crop (or the unsatisfactory portion thereof) to the Grower as the only compensation due, or (b) sell the crop (or the unsatisfactory portion thereof) for feed purposes and pay the Grower the net proceeds after expenses and after deducting any advances, charges or partial payments...."

found that the seed grown by Pline germinated at levels of 91% and 94%. The trial court found that Pline's crop did in fact meet Asgrow's normally accepted standards, and concluded Asgrow had breached its contracts with Pline.

Although many issues have been raised in this appeal, we focus primarily on one overriding issue; that is, whether there is sufficient, competent and admissible evidence in the record to support the trial court's finding that Pline's crop seed met Asgrow's 85% germination standards. Findings of fact based upon competent, though conflicting, evidence will not be disturbed on appeal unless they are clearly erroneous. I.R.C.P. 52(a). *Harper v. Hoffman*, 95 Idaho 933, 936, 523 P.2d 536, 539 (1974); *DeAtley Corporation v. Otto*, 95 Idaho 586, 588, 513 P.2d 638, 640 (1973); *King v. McDonald*, 90 Idaho 272, 280, 410 P.2d 969, 973 (1966).

■ Asgrow contends that the district court's finding that the seed from Pline's two fields germinated at the level of 91% and 94% cannot be substantiated by the evidence. We disagree.

Pline testified that he took samples of the corn seed he grew and tested some himself, and sent some to the state seed laboratory for analysis. He further testified that the seed he tested germinated at about 95%.

A state seed analyst testified that the seed submitted to him by Pline, and which was tested at the state laboratory, germinated at the level indicated on the certificates of germination given to Pline; 94% and 91% respectively. The seed analyst further testified that these results were consistent with the method of drying the seeds used by Pline prior to submitting the seed.

Asgrow attempted to show that the seed Pline submitted to the state seed laboratory was not from Pline's fields. However, the trial court's finding of fact that the corn seed grown by Pline germinated at 94% and 91% indicates that the court, upon listening to the testimony of Pline and noting his demeanor on the stand, found his testimony credible. Absent a showing in the record

that this finding is clearly erroneous, we will not reverse. *Javernick v. Smith*, 101 Idaho 104, 106, 609 P.2d 171, 173 (1980).

In an attempt to show that the trial court's finding is clearly erroneous, Asgrow contends that the above two items of evidence introduced by Pline in support of the finding by the court of 91% and 94% germination were admitted improperly and over objection. Additionally, Asgrow contends that it was denied cross-examination to show why Pline's testimony was more probably not true than true. We disagree with these contentions.

■ Asgrow objected to Pline's testimony as to the results of his home test on the germination level of his crops. Asgrow contended that no proper foundation was laid for the test and for Pline's qualification to make the test. Asgrow also objected on the grounds of materiality and relevancy. Pline previously had testified to having twenty years experience raising corn seed. Before testifying to the result of his tests, he detailed where he had obtained the seed for his tests and how the tests were conducted. Pline's testimony established that the seed for the test came from both of his fields after the frost had occurred and just prior to the time his fields were harvested. It then became a matter of discretion of the trial judge to determine at what point in the testimony an adequate foundation had been laid for the admission of the results of the tests run by Pline. In admitting the evidence the trial court observed that, "It may be highly relevant, and it doesn't take any particular expertise to count what sprouted and what didn't. . . ."

In the case of *Carscallen v. Coeur d'Alene Etc. Co.*, 15 Idaho 444, 98 P. 622 (1908), Chief Justice Ailshie wrote:

"No very nice distinction has ever been drawn or fixed rule established by which a trial judge shall determine the exact amount of knowledge, experience and skill a so-called expert shall have before permitting him to testify before the jury. That question must be determined in the first instance by the court. (Rogers on Expert Testimony, secs. 1 to 4.) After

the evidence is in, its weight and credibility is to be judged solely by the jury, and they will give it such weight as they think it is entitled to, and, indeed, if it runs counter to their convictions of truth in the exercise of their own knowledge and judgment, they may disregard it entirely." 15 Idaho at 452, 98 P. at 624. It is for the trial court, in the exercise of its discretion, to determine such preliminary questions and this court will not interfere unless the discretion is abused. *Erickson's Dairy Prod. Co. v. Northwest Baker I. Mach. Co.*, 165 Or. 553, 109 P.2d 53 (1941). If the judge as the trier of the facts, after admitting the evidence, later determined that Pline's test results should be given little or no weight, he could have disregarded it entirely. We find no abuse of discretion and we uphold the trial court's ruling.

■ Asgrow also objected to the admission into evidence of the test results from the state seed laboratory. Asgrow argued that the evidence was not relevant and that there was a lack of foundation as to the preparation of a suitable sample for submission to the state laboratory by Pline. Again, the issue in question was the level of germination of Pline's crops. Tests ascertaining the level of germination were highly relevant, especially in view of Asgrow's failure to submit samples of Pline's seed to a state or federal testing laboratory. The objection as to foundation again challenges the credibility of Pline's testimony as to what seed he submitted to the state laboratory. As stated above, the trial judge apparently believed Pline's testimony that he submitted seed from the fields covered by the contracts. Pline's testimony provides adequate foundation as to the preparation of the seed sample submitted.

Pline submitted more than one sample to the state seed laboratory. He submitted seed that he picked from the two fields. He dried this seed himself. He also submitted seed that he had recovered from the seed delivered to Asgrow pursuant to the contracts. Asgrow contends that the trial court improperly restricted Asgrow's cross-examination of Pline by sustaining an objection to a question asked of Pline as to the difference in the results from the tests run by the state seed laboratory.

■ The objection made by Pline's counsel was that, under the guise of asking Pline to explain or make a comparison between results of tests then in evidence and certain test results not in evidence, Asgrow was seeking to get into the trial record test results that could only properly be admitted through the testimony of the person who had conducted the tests. Pline's counsel argued the question called for hearsay and called for Pline to make comparisons and draw conclusions that should properly be made only by the trier of the facts. The trial court sustained the objection noting that Pline's answer, whatever it might be, would make no difference in the court's determination of the validity of the various tests, and therefore his answer to the question was immaterial. The trial court permitted Asgrow's counsel to extensively cross-examine Pline concerning the various samples he submitted for testing. There was no showing by Asgrow that the test results it sought to admit were unavailable to Asgrow for admission later in the trial. A trial court has broad discretion in the admission of evidence at trial and its judgment will only be overruled when there has been clear abuse of discretion. *State v. Terry*, 98 Idaho 285, 286–287, 561 P.2d 1318, 1319–1320 (1977). We do not find an abuse of discretion here.

■ Asgrow also contends that the court erred in sustaining Pline's objection, on the ground of lack of foundation, to a question asked of the state seed analyst. The question was directed to the likelihood of seed molding when dried in the manner of the sample which was tested by the state laboratory. The court sustained the objection, finding that there were too many unknown variables such as how much actual moisture was present during the drying process. We do not find an abuse of discretion here.

■ We conclude that the evidence supports the trial court's finding of fact that the seed met Asgrow's standards. In view

**832**

of this conclusion, we hold the trial court properly found that Asgrow breached its contracts with Pline.

■ Asgrow next argues that the evidence does not support the amount of damages awarded to Pline. We disagree. The trial court awarded a total of $20,993.25 to Pline. This figure is found by multiplying the poundage of corn seed, realized by Asgrow after cleaning and processing, by the agreed twenty-five cents per pound contract price, and adding to this the guarantee of $500 per acre contained in the rider attached to each contract. To arrive at the total, the court deducted the amount of seed furnished by Asgrow and the picking expense paid by Asgrow. Twenty-eight acres of corn seed were covered under the two contracts for a total, under the rider of $14,000. The net per pound contract price equalled $6,993.25, making the total of $20,-993.25 due.

■ At trial the parties disputed the meaning and effect of the contract riders.[3] The trial court found the language of the riders to be ambiguous and susceptible of more than one interpretation. It can be seen that one possible ambiguity is whether the guarantee of $500 per acre was intended to be a bottom limit of what Pline could expect on his contracts, or whether it was intended as a bonus. Considerable contradictory evidence was received by the trial court on what the parties intended by the language used. The district court concluded that Asgrow, who provided all of the language used, should have the ambiguities construed against it. This is in accord with the rule announced in Idaho. *Werry v. Phillips Petroleum Company*, 97 Idaho 130, 136, 540 P.2d 792, 798 (1975); *Chapman v. Haney Seed Co.*, 102 Idaho 26, 29, 624 P.2d 408, 411 (1981).

■ The trial court found that Pline's crops were not "lost or destroyed" or excessively abused by "acts of God." The trial court construed the contract rider language to mean that Pline was entitled to receive $500 for each of the twenty-eight acres upon which he produced corn for Asgrow. In addition, the court found that Pline was entitled to twenty-five cents per pound for the net weight of the seed produced. In view of the rule of construction set forth in *Werry* and *Chapman* we cannot say the trial court committed error in its interpretation of the contract rider language.

Asgrow next contends that the trial court went beyond interpreting ambiguous language in the contract and, in effect, rewrote the contract. The trial court found that Asgrow was the author of the contract and many key phrases, such as "suitable for seedsmen's use" and "Asgrow normally accepted standard" were ambiguous. The trial court properly construed these ambiguities against Asgrow in determining that Asgrow breached the contracts with Pline. The trial court did not go beyond the interpretation of ambiguous language. Its construction of the ambiguous language is supported by substantial competent evidence and will be upheld. *Werry v. Phillips Petroleum Co., supra.*

■ Finally, Asgrow contends that the district court committed error in adopting, in total, Pline's proposed finding of fact and conclusions of law. This is asserted to be violative of I.R.C.P. Rule 52(a) which requires "the judge in all actions tried upon the facts without a jury to 'find the facts specially and state separately [his] conclusions of law thereon and direct the entry of the appropriate judgment'." *In re Estate of Stibor*, 96 Idaho 162, 163, 525 P.2d 357, 358 (1974). Again we disagree with Asgrow's contention.

---

3. The Asgrow Seed Company's bailment contract rider states:

"Asgrow Seed Company guarantees the performance of the attached contract for the production of 3–168 corn seed in 1975 to the degree of $500.00 per harvest acre, plus the compensation per pound as stated on the attached contract.

"The above guarantee is not applicable if above crop is lost or destroyed by acts of God such as wind, freeze, hail, flood or fire. (Heat is excluded).

"This rider specifically guarantees the production of this corn. It does not cover excessive crop abuse due to the above listed acts of God."

We recognize that our Supreme Court has looked unfavorably upon a trial court engaging in the practice of deciding a case, asking the prevailing party to submit proposed findings of fact and conclusions of law, and then adopting those findings verbatim. *Compton v. Gilmore*, 98 Idaho 190, 193, 560 P.2d 861, 864 (1977); *Matheson v. Harris*, 98 Idaho 758, 761–762, 572 P.2d 861, 864–865 (1977). However, that unfavored procedure was not followed here. Here the trial judge requested proposed findings and conclusions from both sides prior to making his decision in the case. In *Marshall Brothers, Inc. v. Geisler*, 99 Idaho 734, 737 n.1, 588 P.2d 933, 936 (1978) our Supreme Court stated that "[t]he best procedure to follow if assistance of counsel is sought in drafting of findings of fact and conclusions of law is, as noted in *Compton*, to request proposed findings and conclusions from both sides and to utilize these in the drafting of the court's findings and conclusions." In *Compton*, the court indicates the request should be made prior to the trial judge making a decision. Here the trial judge followed the recommended procedure of our Supreme Court.

To adopt verbatim a party's proposed findings of fact and conclusions of law is not the best practice, even if both sides have submitted proposals. However, it is not reversible error where, as here, those findings and conclusions essential to the decision reached are sufficient and are supported by the evidence. *Marshall Bros., Inc. v. Geisler, supra.*

Judgment affirmed, costs to respondent. No attorneys fees on appeal.

WALTERS, C. J., and BURNETT, J., concur.