706 P.2d 34

**Delbert CLAMPITT and Delsie Clampitt, husband and wife, Plaintiffs-Respondents,**

v.

**A.M.R. CORPORATION, a corporation, Defendant-Appellant,**

and

**Judd Farms, a corporation; L.J. Rice & Sons, Inc., a corporation; and Southwestern Financial Corporation, a corporation, Defendants.**

No. 15071.

Supreme Court of Idaho.

May 6, 1985.

Rehearing Denied Sept. 20, 1985.

Blair Grover, of Grover & Walker, Rigby, for defendant-appellant.

Jay R. Friedly, of Hall & Friedly, Mountain Home, for plaintiffs-respondents.

BAKES, Justice.

■ The sole issue in this appeal is whether the amounts retained by the vendor pursuant to forfeiture of a real estate purchase contract constitute an unconscionable penalty to the defaulting purchaser. We affirm the judgment of the trial court which held that the amounts forfeited under the contract bear a reasonable relation to the vendor's actual damages and therefore do not constitute an unconscionable penalty.

A.M.R. Corporation agreed to purchase from Clampitts a 3,800-acre farm located in Elmore County, Idaho. The purchase price was $2.3 million to be paid as follows: $10,000 down at the execution of the purchase agreement in September, 1974; $250,000 in December, 1974; $250,000 in February, 1975; and the balance in semiannual payments of $89,500 each. Of the total farm acreage, 2,140 acres were under irrigation, approximately 1,400 acres were yet to be developed with water rights reserved but not yet put to beneficial use, and the balance was dry land. After executing the agreement the purchaser, A.M.R. Corporation, took possession of the farm. Vendors, Clampitts, retired from farming and moved to the State of Washington, although the vendors remained as lessees of record in a joint venture with their son during the growing season of 1975. It was purchaser's intention to lease out the farm, develop the unirrigated portions, and eventually divide the entire farm into smaller portions to be sold at a profit. A.M.R. had previously purchased, subdivided and sold at a profit an adjoining and even larger farm.

Purchaser had difficulty in making the initial payments, and two subsequent contract amendments were executed to allow for late payments. Purchaser was unable to discharge the semiannual payments and continued negotiations were unfruitful. In September, 1976, vendors filed the initial complaint in the present action seeking a declaration of forfeiture, return of the farm, and a determination of quiet title. Purchaser counterclaimed that the amounts retained in forfeiture constitute an unconscionable penalty.

The purchaser apparently stipulated to partial summary judgment granting return of the property, judgment of forfeiture, and quiet title in favor of the vendors. At the time of the summary judgment stipula-

tion there was an alleged oral settlement agreement between the parties having to do with vendors' repossession of the property, obtaining of new financing, developing of the unirrigated portions, and possible resale of the property to purchaser. This alleged settlement agreement was reduced to writing, but purchaser refused to execute it since the terms were in dispute.

The vendors returned from Washington, took possession of the farm, and obtained new financing in excess of $2 million in order to discharge the existing indebtedness which was in default and to install a major irrigation system to apply and preserve the water rights, then due to expire unless put to beneficial use. After successfully refinancing and developing the farm, the vendors then resold the farm with the new irrigation improvements to a different purchaser for $3.8 million.

The case proceeded to trial on purchaser's counterclaim. At the time of forfeiture purchaser had paid $510,000 in principal and $221,753.24 in interest to the vendors. Purchaser also claims consideration of other amounts paid in taxes, improvements and personal property. The trial court found that vendors' expenses in repossessing, refinancing, and reselling the property were so "intertwined" that those expenses must be considered as damages. The trial court found vendors' actual damages to be $305,648,[1] consisting of expenses for weed eradication, sprinkler pipe repair, loan fees, attorney fees and real estate commissions for the resale. The trial court also found the reasonable rental for the property was $447,518.51 during the two years in which purchaser was in possession of the property, and that there had been no depreciation or appreciation in the value of the property during the purchaser's possession. The court concluded that the purchaser "failed to establish, by a preponderance of the evidence, that under the facts here the payments it made on the contract were so disproportionate to the actual damages incurred by [vendors] as a

result of [purchaser's] breach as to be exorbitant amounting to an unconscionable penalty."

The purchaser has appealed, arguing that many of the items of vendors' damages as found by the trial court were unsupported by the evidence or improperly allowed.

■ The appellant, defaulting purchaser in the present case, appears to take the position that all amounts previously paid on a forfeited real estate contract constitute "unjust enrichment" to the vendor and that vendor may only retain those amounts proved by substantial evidence to be "set-offs against unjust enrichment." This position is not consistent with our prior cases.

" 'Generally speaking, parties to a contract may agree on liquidated damages in anticipation of a breach, in any case where the circumstances are such that accurate determination of the damages would be difficult or impossible, and provided that the liquidated damages fixed by the contract bear a reasonable relation to actual damages. But, where the forfeiture or damage fixed by the contract is arbitrary and bears no reasonable relation to the anticipated damage, and is exorbitant and unconscionable, it is regarded as a "penalty", and the contractual provision therefore is void and unenforceable.' *Graves v. Cupic*, 75 Idaho 451, 456, 272 P.2d 1020, 1023 [1954].

. . . .

"... In seeking relief from the forfeiture, the burden of proving such facts rested upon [the defaulting purchasers]." *Howard v. Bar Bell Land & Cattle Co.*, 81 Idaho 189, 197, 340 P.2d 103, 107 (1959).

Further, "it is for the trial court to determine under the facts of any particular case whether the amount stipulated as damages bears such reasonable relation to the damages actually sustained as to be enforceable as a provision for liquidated damages." *Nichols v. Knowles*, 87 Idaho 550,

---

1. The trial court did not list the specific items in arriving at this sum, and the briefs disagree slightly on what items were included in the sum.

556, 394 P.2d 630, 633 (1964). The finding of the trial court as to whether the forfeiture and liquidated damages constitute an unconscionable penalty will not be overturned on appeal unless it is clearly erroneous. I.R.C.P. 52(a).

■ In the present case the purchaser voluntarily agreed in the purchase contract that in the event of purchaser's default the vendor had the remedy of retaining all amounts paid, and that purchaser would forfeit all interest in the property to the vendors. Thus the purchaser had the burden of proof at trial to show that these liquidated damages bore no reasonable relation to the actual damages. *Howard v. Bar Bell Land & Cattle Co., supra.*

## I

### Liquidated Damages

■ At the time of forfeiture, purchaser had paid $510,000 in principal and $221,753 in interest on the purchase contract. Purchaser had also paid the amount of $7,338 toward an irrigation mainline which the seller repossessed with the property. Purchaser had also paid $13,783 for the 1975 property taxes which "was part of [the] contract obligation, the same as [the] payments upon the principal balance," *Anderson v. Michel,* 88 Idaho 228, 239, 398 P.2d 228, 234 (1965), and should be viewed as an amount paid under the contract.[2] Therefore, the amounts paid by purchaser which were forfeited as liquidated damages are:

Amounts forfeited by purchaser

| | |
|---|---|
| Principal | $510,000 |
| Interest | 221,753 |
| Taxes | 13,783 |
| Irrigation equipment | 7,338 |
| Total | $752,874 |

**2.** Vendors concede in their brief that the trial court "evidently forgot to consider the taxes ... and payment for irrigation pipe ... paid by A.M.R."

Purchaser also claims $24,161 paid in principal and interest for mobile homes which were purchased in a separate agreement from the vendors and which were left on the property and eventually resold by the vendors. The trial court noted that even though vendors retained no title or lien interest in the mobile homes, and that neither the stipulation or the parties nor

## II

### Actual Damages

#### A. *Market value*

■ In addition to A.M.R.'s claim that the amount forfeited exceeded the reasonable rental value of the property and other allowable damage items, A.M.R. alleges that the market value of the premises increased from the date of execution of the contract until the time of the breach, and that gain should have been considered by the trial court in determining the amounts forfeited by the purchaser. This Court has held in the past that, in the absence of a liquidated damage clause in the contract, "the measure of damages for breach of an executory contract of sale is the difference between the contract price and the market value of the premises at the time of the breach ...," *State ex rel. Robins v. Clinger,* 72 Idaho 222, 230, 238 P.2d 1145, 1150 (1951). Where there is a liquidated damage clause, a similar determination of the difference between contract price and market value of the premises should be made to determine whether or not what the seller is acquiring back as a result of the forfeiture is more valuable than what he contracted to sell. While the rule is generally stated as the difference in values *at the time of the breach,* "this rule necessarily presupposes that the vendor is free to use or dispose of the property on the date of breach. Accordingly, if the vendee has interfered with the vendor's freedom in this respect, by retaining possession or asserting an interest in the property, the vendor may include any additional damages caused thereby in the amount necessary to give

the court order returning possession of the farm to the vendors covered the mobile homes, nevertheless the vendors retook possession of the mobile homes and apparently eventually sold them. The trial court concluded that the mobile homes were not part of the real estate contract and transaction and therefore did not include the amounts paid for them in the forfeiture calculation, although it noted that the purchaser would have a separate claim against the vendors for "fair compensation therefor." We agree.

him the benefit of his bargain." 77 Am. Jur.2d Vendor and Purchaser § 489, p. 614. *See also Honey v. Henry's Franchise Leasing Corp.*, 64 Cal.2d 801, 52 Cal.Rptr. 18, 415 P.2d 833 (1966).

In this case the trial court found that there was no increase in market value. The trial court determined the relevant period to be from July of 1974 when A.M.R. purchased the property until July of 1976 when the seller actually terminated the contract for failure of the vendee to cure the default. We find no merit in A.M.R.'s argument that the trial court should have used an earlier date in December, 1975, the date of breach when it actually failed to make the payments. Subsequent to that time the parties mutually rescheduled payments, and it was not until July of 1976 that the vendors actually terminated the contract. The vendors submitted expert testimony concerning the market value of the premises as of July of 1976, and based upon that evidence the trial court found that there had been no increase or decrease in the value of the real property during that two-year period. The trial court's findings are supported by substantial competent evidence and are not clearly erroneous, and therefore are affirmed. I.R.C.P. 52(a).

B. *Rental value*

■ In determining whether a liquidated damages provision on default constitutes an unreasonable forfeiture, one element of damage to consider is the loss of rental value during the time the defaulting purchaser was in possession. *Anderson v. Michel*, 88 Idaho 228, 398 P.2d 228 (1965). The trial court determined that the reasonable rental value for the entire farm for the two-year period that the vendees were in possession to be the sum of $447,518.51. The trial court calculated that rental value by first determining that the rental value for the portion of the acreage under cultivation was $401,252, using the landlord's crop share for those acres based upon average prices and average yields of the area. The trial court then determined the rental

value of the undeveloped land to be $46,266.51, based upon what a reasonable return on investment or equity would yield for the entire farm, less the $401,252 allocable to the irrigated acreage under cultivation. The purchaser, who presented conflicting evidence suggesting that the actual rental proceeds were lower, argues that the trial court's consideration of evidence of return on investment in arriving at rental value was improper. However, return on investment in property is circumstantial evidence relevant to determining a property's rental value. Neither the actual rental received nor the average rental received on comparable properties is conclusive evidence as to what is a reasonable rental value. Both values are relevant evidence upon which to base a finding of reasonable rental value, as is evidence of return on investment. The trial court's finding of rental value for the entire farm in the amount of $447,518.51 was based upon substantial and competent evidence and therefore will not be disturbed on appeal.

C. *Costs of repossession, refinancing and resale*

■ The costs which a seller incurs in repossessing the property from a defaulting purchaser are actual damages suffered by the seller. *See Williamson v. Smith*, 74 Idaho 79, 256 P.2d 784 (1953). A vendor may also claim as actual damages any costs which flow from the breach and which could have been within the contemplation of the parties at the time of contracting. *See* Annot. 52 A.L.R. 1511, 1512 (1928). It is possible that these additional damages could include, in the proper case with proper findings of fact, the costs of refinancing or reselling the property. This Court noted in *Anderson v. Michel, supra*, that "the possible expense of resale of the property" may be considered as actual damages to a vendor in determining whether an unreasonable forfeiture has occurred.

■ In the present case the trial court found that the costs of repossessing, refinancing and reselling the property were "intertwined and must be considered to-

gether." This finding of fact was supported by substantial and competent evidence. At the time of executing the purchase agreement, purchaser was aware of the underlying indebtedness and the necessity of improving the unirrigated land. Purchaser was aware that a breach on its part could cause a breach on the underlying contract and therefore jeopardize the loss of the entire property. Purchaser was also aware that the failure to develop the unirrigated land and apply water rights to beneficial use might result in the loss of the water rights. At trial both parties testified as to the urgency for someone to cure the defaults on the underlying contracts and to apply the water rights to beneficial use prior to expiration.[3] Prior to losing possession, the purchaser was also trying to obtain refinancing in order to cure the defaults, develop the irrigation system and hopefully subdivide and resell the property. Therefore, we find no error in the trial court's considering these costs as damages to the vendors in determining the unreasonableness of the forfeiture.

█ The purchaser argues that even if the resale costs are allowed, only a portion of the realtor's commission should be considered. The trial court allowed the entire commission on the $3.8 million resale value rather than a commission on only the $2.3 million which was the value of the property when the purchaser yielded possession. Purchaser argues that if allowed a vendor could always defeat an unjust enrichment claim by improving and reselling the property. However, the trial court evidently found that the vendor's need to improve the irrigation system and resell the property resulted from purchaser's breach. As a result of the trial court's finding that the need to resell flowed from the breach, we find no error in the trial court's allowance of the entire realtor's commission as actual damages to the vendor based upon these particular facts.

D. *Miscellaneous damages*

There were several other various items of alleged damage, some of which the trial court included in the actual damage sum, others of which the trial court did not include, and still others which it is not certain whether they were included or not. After considering each item and the objections to them, and eliminating some of them from our consideration on this appeal, we nevertheless conclude that the vendors' actual damages approximated the amount forfeited as reflected in the following schedule:

Vendors actual damages:

| | |
|---|---:|
| Reasonable rental | $447,518.00 |
| Damage to sprinkler pipes | 800.00 |
| Costs of repossession and refinancing: | |
|   Loan commitment | 600.00 |
|   Loan commitment | 11,000.00 |
|   Loan fee & interest | 44,908.00 |
|   Title policy & fees | 5,954.00 |
|   Appraisal | 250.00 |
|   Attorney fees | 4,500.00 |
|   Attorney fees | 6,730.00 |
|   Title fees | 200.00 |
| Costs of resale: | |
|   Realtor's commission | 224,640.00 |
| Total | $747,100.00 |

When comparing the $747,100 in actual damages to $752,874, the amount forfeited under the liquidated damage clause, the application of the liquidated damage clause in this case appears fair and reasonable.[4]

3. At oral argument, purchaser's attorney argued that the water rights could have been extended by a mere application for extension. However, the record suggests that neither party was aware of this possibility, and the purchaser's own testimony characterized the need to apply the water rights as one of the "emergencies" facing the parties.

4. The trial court found the vendor's damages to be $531,413.27, which included $225,765 in lost "net" rental and $305,648 in expenses because of default and resale. The difference between the trial court's total damage calculation and our calculation results primarily from the trial court's determination of the rental to be $225,-765, which it computed by first offsetting from the gross rental figure of $447,518 the interest paid by purchaser of $221,753. To more accurately reflect the amounts forfeited by the purchaser, and the vendor's damages, we have listed the gross rental as damages, and the interest paid as an amount forfeited by the purchaser. As a result, the actual damages listed above are approximately $221,753 more than the trial

*Cf. Anderson v. Michel,* 88 Idaho 228, 398 P.2d 228 (1965); Institute on Real Estate Defaults, Merlyn W. Clark, *Defaults of Executory Land Sale Contracts—Vendors Remedies,* p. 92, n. 66 (Idaho Bar Foundation 1982). The foregoing calculations make no allowance for compensation to Mr. Clampitt for the several months' time which he personally spent in developing and installing the new irrigation system, which should be an additional factor in considering whether the actual damages bear a reasonable relationship to the liquidated damages.

We conclude that the trial court's determination that the forfeiture clause in the contract does not operate as an unconscionable forfeiture in this case is supported by substantial and competent evidence and is not clearly erroneous under I.R.C.P. 52(a). Accordingly, the judgment of the trial court is affirmed.

Costs to respondents. No attorney fees.

DONALDSON, C.J., and SHEPARD and HUNTLEY, JJ., concur.

BISTLINE, Justice, dissenting.

The very facts stated in the Court's opinion veritably wave a large red flag. The 1974 agreed purchase price was $2.3 million. After the property was returned to the vendors it was again sold—this time for $3.8 million. Only two farming years had intervened, 1975 and 1976. After the vendors went back into possession, they did install a major irrigation system to portions of the huge farm which at the time of the 1974 sale was sagebrush and had not theretofore been served with water. These were improvements made by the vendors *after* they had regained possession, and it is beyond dispute that such expenditures would have increased the sale price on the $3.8 million second sale. The buyers in their two-year occupancy had paid almost three-quarters of a million dollars, i.e., $731,753, in payments of principal and interest, $13,783 in real estate taxes, and

$7,338 on the sellers' contract to purchase the sprinkling equipment.

The majority who may believe itself applying the rule of *Graves v. Cupic,* 75 Idaho 451, 272 P.2d 1020 (1954), has charged the vendees with one-quarter million dollars which was the commission the vendors paid on the sellers' resale which brought into them $1.5 million dollars *more* than they were receiving on the cancelled contract. The majority also charges the vendees with over $60,000 spent in the refinancing, and over $11,000 in attorney's fees, unspecified, but apparently incurred in refinancing and/or reselling. By adding in those large amounts, the majority is able to then compare $747,100 in actual damages to the $752,874 forfeited as agreed liquidated damages. This is all said to be possible because "the trial court evidently found that the vendor's need to improve the irrigation system and resell the property resulted from the purchaser's breach." Here is another of this Court's recurring *ipse dixit*'s. Because "evidently found" is then in the following sentence transformed into the majority's finding "that the need to resell flowed from the breach." What the trial court actually signed as a finding, and which was not exactly what he wrote for himself in his Memorandum Decision, is:

### XXIV

Plaintiffs' expenses caused by defendant's defaults and plaintiffs' expenses in reselling the farm to a third party are intertwined and must be considered together.

It is highly doubtful that Finding No. XXIV is a finding of fact, but rather the conclusion of law it appears to be. Whether it be a finding or a conclusion, it finds no support in any of the other findings, and presents a novel and unsupported concept of the law—wholly at odds with *Graves* and its progeny. Moreover, the finding is

court's figure, and our figure for the amounts forfeited by purchaser is larger by that same amount. The differences are merely a wash

when making a comparison of the actual damages to the amount forfeited.

not of the trial court's manufacture, but a product of the ingenuity of plaintiffs' counsel who prepared the findings and conclusions for the trial court at the trial court's direction, in direct contravention of this Court's directive in *Compton v. Gilmore,* 98 Idaho 190, 560 P.2d 861 (1977), repeated in *Matheson v. Harris,* 98 Idaho 758, 572 P.2d 861 (1977), and still the case law in Idaho.[1] In *Marshall Bros. v. Geisler,* 99 Idaho 734, 737 n. 1, 588 P.2d 933, 936, n. 1 (1978), Justice Bakes wrote for the Court:

> We do not alter our strong admonitions to both bench and bar in this state, as expressed in *Matheson v. Harris,* 98 Idaho 758, 572 P.2d 861 (1977), and *Compton v. Gilmore,* 98 Idaho 190, 560 P.2d 861 (1977), that I.R.C.P. 52(a) *requires the trial court* in a judge-tried case *to exercise its independent judgment in the preparation of findings of fact and conclusions of law.* The best

procedure to follow if assistance of counsel is sought in the drafting of findings of fact and conclusions of law is, as noted in *Compton,* to request proposed findings and conclusions from both sides and to utilize these in the drafting of the court's findings and conclusions. (Emphasis added.)

In this particular case, where the trial judge conscientiously labored to write his own Memorandum Decision, the foregoing passage would be regarded, and properly so, as mere diatribe. But here, the reason for the rule is self-proving. The trial court was justified in signing his name to a set of findings and conclusions which at first glance give the appearance of being mere paraphrasing by sellers' counsel. However, in at least one particular, this is not so. In order is a comparison of Finding XXIV with the court's own statement:

| | |
|---|---|
| Plaintiffs' expenses <u>caused</u> by defendant's defaults and plaintiffs' expenses in reselling the farm to a third party are intertwined and must be considered together. | The other expenses <u>incurred</u> by Plaintiffs after Defendants default were intertwined with the resale of the property and must accordingly be considered therewith. |
| Finding of Fact No. XXIV | Corrected Memorandum Decision |

Expenses Caused are not the Equivalent of Expenses Incurred

---

Whether or not counsel took undue literary license in writing a self-serving of that which the trial court had written is of little moment. It may have as easily been wholly inadvertent. Either way, the fault is

more with the majority and the use made of the Finding No. XXIV, and I quote directly from the majority who best demonstrate the taking of literary license:

1. As Judge J. Skelly Wright said in his "Seminars for Newly Appointed United States District Judges," which was approvingly quoted by the United States Supreme Court in *United States v. El Paso Natural Gas Company,* 376 U.S. 651, 656, n. 4, 84 S.Ct. 1044, 1047, n. 4, 12 L.Ed.2d 12 (1964), and by this Court in *Compton, supra,* 98 Idaho at 193, 560 P.2d at 864:

   "I suggest to you strongly that you avoid as far as you possibly can simply signing what

> some lawyer puts under your nose. These lawyers, and properly so, in their zeal and advocacy and their enthusiasm are going to state the case for their side in these findings as strongly as they possibly can. When these findings get to the courts of apeals they won't be worth the paper they are written on as far as assisting the court of appeals in determining why the judge decided the case."

| The other expenses incurred by Plaintiffs after Defendant's default were intertwined with the resale of the property and must accordingly be considered therewith. | Plaintiffs' expenses caused by defendant's defaults and plaintiffs' expenses in reselling the farm to a third party are intertwined and must be considered together. | In the present case the trial court found that the costs of repossessing, refinancing and reselling the property were "intertwined and must be considered together." |
|---|---|---|
| Corrected Memorandum Decision | Finding of Fact No. XXIV | Majority Opin. |

As a follow-up to observing the remarkable metamorphosis of an honest but legally questionable statement of the trial court to a Supreme Court finding, it is only necessary to observe the majority's use of it in Part C of the majority's opinion, to see the distortion effected: "This finding of fact was supported by substantial and competent evidence." Having recreated the fact to its own liking, the majority then, ignoring that it is more of conclusion than a fact and ignoring the singular fact that the trial court did *not* in the least attempt to substantiate it,[2] lay out what is believed to be a justification.

The groundwork for this remarkable excursion into fantasy is said to be found by melding together an unrevealed statement from an ancient annotation and a wee bit of dictum in this Court's *Anderson v. Michel,* 88 Idaho 228, 398 P.2d 228 (1965). "A vendor may also claim as actual damages any costs which flow from the breach and which could have been within the contemplation of the parties at the time of contracting.... This Court noted in *Anderson v. Michel, supra,* that 'the possible expenses of resale of the property' may be considered."

When Justice Bakes writes "see," instead of quoting and citing, I follow that admonition.

The annotation does not deal with a case based upon a claim of unjust enrichment following forfeiture of a title-retaining real estate contract. Rather the annotation starts out with this prefix: "The rights of the vendor upon his rescission of the contract, as distinguished from an action for

damages for its breach, are beyond the scope of the annotation. Cases involving actions for the recovery of liquidated damages are also beyond its scope," 52 A.L.R. 1511, which should be enough said. If not, the full statement of what Justice Bakes has paraphrased, with citations omitted and not omitted is:

In general, the basis upon which damages will be assessed against a vendee for breach of his executory contract to purchase real estate is compensation to the vendor for the loss or injury sustained by him, by reason of the vendee's breach ...; *the amount, however, to be limited to such damages as are the natural and probable result of the breach (Dullea v. Taylor (1874) 35 U.S.Q.B. 395), and which might reasonably have been within the contemplation of the parties (Hurd v. Dunsmore (1884) 63 N.H. 171).* 52 A.L.R. 1512 (emphasis added).

As will be noted from reading the Appendix, the trial court did not only rely upon the annotation, but did not mention it, nor do I see where counsel for either party had the audacity to cite it. Moreover, it must be particularly noted that the trial court made no finding, or pointed to no evidence, that the expenses of refinancing and of resale were within the contemplation of the parties at the time they contracted. Justice Bakes and his majority attempt to provide that factual determination in their appellate decision—which does not seem to be in keeping with the Justice's much-to-the-

---

**2.** Whether I am correct in this assumption is best gleaned from the trial court's Memoran-

dum Decision, a copy of which is attached as Appendix A.

contrary usual views about appellate fact finding.

Counsel-drawn Finding No. XXXIII has no counterpart in the trial court's Memorandum Decision, other than this one sentence: "Accordingly, except for the $5,000 claimed for lost advertising, the $310,648.00 in expenses claimed by Plaintiffs was reasonably established by a preponderance of the evidence." That, to my mind, is a rather cavalier way of disposing of $310,648—which is bad, and insufficient, but no justification for counsel's literary license in drafting Finding No. XXXIII:

Plaintiffs incurred $305,648 in expenses caused by defendant's defaults and from subsequent sale of the farm to a third party after defendant's defaults.

There are no findings, as such, or statement of reasoning in the Memorandum Decision which reflect how this amount was arrived at, for which reason the Court is most often disposed to remand for adequate findings rather than to manufacture its own.

In defending his findings, Justice Bakes *surmises*, and I do not use the word guardedly, "It is possible that these additional damages could include, in the proper case

with proper findings of fact, the costs of refinancing or reselling the property." For this second, all-encompassing, wholly conjectural *ipse dixit*, no authority is cited, other than *Anderson v. Michel*, 88 Idaho 228, 398 P.2d 228 (1965). That case is quoted from for the proposition that *possible* expense of a resale may be considered in applying the *Graves* rule. What this Court actually stated in *Anderson* was:

Having in mind the costs and expenses of this litigation, the possible expense of a resale of the property, and the magnitude of the transaction, we conclude that the amount retained by plaintiffs as liquidated damages bears a reasonably relation to the actual damages sustained and is not so exorbitant and unconscionable as to constitute a penalty. Cf. *Graves v. Cupic*, 75 Idaho 451, 272 P.2d 1020 (1954). *Anderson, supra*, at 239, 398 P.2d at 235.

A review of this Court's file will reflect that the phrase upon which the majority's entire opinion is premised was an inadvertent gratuity on the part of the Supreme Court in paraphrasing the language of the trial court, the Honorable James G. Towles.[3] Judge Towles made a conclusion

---

**3.** It may be worthy of note that his decision was that *Graves* had no application. Conclusions of Law Nos. 6 and 7 stated:

The contract between the plaintiffs and the defendants was an executory contract for the sale and purchase of real property, with the contract performable in the state of Washington and the contract is governed by the law of the state of Washington.

(7) Under the law of the state of Washington, regardless of whether the termination of the contract is considered a penalty or forfeiture, on the one hand, or a stipulation for liquidated damages, on the other, the contract of the parties will be enforced according to its terms.

The contract between the plaintiffs and the defendants provides:

"Time is of the essence of this agreement and it is mutually agreed that in the event second parties fail to comply with the terms of this agreement, with any thereof, then first parties may at their option declare this agreement to be null and void in all rights or interests hereby creating or existing in favor of second parties, their heirs or assigns shall utterly cease and determine the premises here contracted to be sold or improvements made

thereon by second parties, shall revert to and revest in first parties their heirs or assigns as absolutely and fully as if this agreement had not been made and first parties shall forthwith be entitled to the possession of said premises and every party thereof into the said improvements and may keep and retain all payments theretofore made as liquidated damages...."

These conclusions were supported by Findings of Fact Nos. 20 and 21 as to Washington law, and as to Conflicts law:

(20) The contract between the parties was executed in Washington by the majority of the parties, and in Oregon by the balance of the parties. This contract involved Oregon and Idaho Real property, and was escrowed in the state of Washington, at the Boyer-Baker Bank in Walla Walla, and the contract called for all payments to be paid there at the bank in Washington. The state of Washington was the state of place of performance of the contract.

(21) The law of the state of Washington, as applicable to title retaining contracts of conditional sale for the sale and purchase of real property, including personal property, is stat-

of law encompassing the *Graves v. Cupic* principle of unjust enrichment where sellers otherwise gain a windfall from buyers who become unable to complete the contract:

> (9) The actual damages to the plaintiffs as sustained, are not grossly disproportionate to the damages stipulated for in the terms of the contract. By application of the contract terms for stipulated damages on the defendants' breach, the plaintiffs herein are not made more than whole, and there results no penalty by application of the contract provision for cancellation and termination of the contract, and retention of moneys paid to the plaintiffs. *Actual damages sustained, and anticipated damages,* both *do bear a reasonable relationship to the sums paid by the defendants on the contract and are not exorbitant or unconscionable to the extent that the same could be considered a penalty under the provisions of the Idaho law.* (Emphasis added.)

In a written, filed Memorandum Decision, he set forth in almost identical language the the necessary computations in comparing actual damages to liquidated damages, and his conclusion:

> The loss occasioned to the seller by purchasers' default, in other words, actual damages, bear a reasonable relationship to the sums paid by the purchasers on the contract and are not exorbitant or unconscionable to the extent they would be considered a penalty even under the provisions of Idaho law, *in view of the magnitude of the transaction.* (Emphasis added.)

The "magnitude of the transaction" language was original with Judge Towles, not with this court. Neither in his findings nor in the evidence was any mention made of possible costs of resale. Unfortunately, in using Judge Towles "magnitude" language, this Court, wholly gratuitously (I doubt that it rises to the label of dictum), responsive to nothing urged by counsel for the parties, unthinkingly interjected the thought of an expense of a possible resale. Little could the Court in 1965 have envisioned that that small and heretofore unnoticed slip of the pen, wholly unsupported in law, wholly unfounded in the case presented, would one day later be used to frustrate the principles of *Graves* and produce a blatant miscarriage of justice. Moreover, the huge consequential damages which the Court today allows, i.e., huge expenses of an immensely profitable resale, are not shown to have been within the contemplation of the parties at the time the title-returning contract was entered into. Nothing in the contract evidences that it was. Justice Bakes uses only pure surmise to intimate otherwise. Generally speaking, this Court has ordinarily recognized the rule of *Hadley v. Baxendale,* 156 Eng.Rep. 145 (1854).

Although there is considerably more which could and should be said about this case and this Court's majority opinion, without any apologies I do hope that it will be noted that my time has been somewhat taken up with other contemporaneous opinions announced or about to be announced. The judgment in this case absolutely should be reversed, or *Graves v. Cupic* and its progeny overruled.

---

ed in the cases of *Ball [Hall] v. Nordgren,* 196 Wash. 68, 81 Pac. (2) 857; *Van Keulen v. Sealander,* 183 Wash. 634, 39 [49] Pac. (2) 19; and *Thiel v. Miller,* 122 Wash. 52, 209 Pac. 1080 [1081]. The law of the state of Washington is that a forfeiture clause, such as contained in the instant contract, is not void as against public policy, regardless of whether or not it is considered a penalty, or a provision for liquidated damages.

APPENDIX A

IN THE DISTRICT COURT OF THE FOURTH JUDICIAL DISTRICT OF THE STATE OF IDAHO, IN AND FOR THE COUNTY OF ELMORE

DELBERT CLAMPITT & DELSIE CLAMPITT, husband and wife, Plaintiffs,

vs.

A.M.R. CORPORATION, a corporation; JUDD FARMS, a corporation; L.J. RICE & SONS, INC., and SOUTH-WESTERN FINANCIAL CORPORATION, a corporation, Defendants.

Case No. 5416

CORRECTED
MEMORANDUM OPINION

APPEARANCES:

Perce Hall, Hall & Friedly, Chartered, Counsel for Plaintiffs

Blair Grover, Grover & Walker, Chartered, Counsel for Defendants

This matter was tried to the Court, post-trial briefs have been submitted, and the matter is ready for decision.

Many of the basic facts are undisputed. Plaintiffs sold Defendant A.M.R. a 3,840 acre farm in 1974 for $2,300,000.00. Defendant purchased the farm with the expectation of dividing it and reselling smaller farming parcels at a profit. 2,140 of the acres were irrigated, about 1,400 more could be developed for irrigation, and the balance was dry land. The sale was by a title retaining real estate contract whereby $10,000 of the price was paid as earnest money; $250,000, plus accrued 9 percent interest from July 11, 1974, was due December 10, 1974; $250,000 more, plus interest, on February 10, 1975; and the balance in payments of $89,500 each, plus interest, on the 10th of December and February of each year until the purchase price was paid. Defendants had difficulty making the $250,000 payments and extension agreements were twice entered into by the parties. As a result, Defendants made and Plaintiffs accepted payments of $140,000 on December 31, 1974, $150,000 on April 14, 1975, and $407,314.24 on July 1, 1975.

As of July 1, 1975, therefore, Defendants had paid a total of $510,000 on the principal of the purchase price; $196,765.74 on accrued interest, and the balance for attorney, collection and escrow fees.

No other payments were made by Defendant on the agreement except a $25,000 payment on April 30, 1976 which paid the interest accrued to that date (Defendant's Ex. 51).

In the meantime, on December 17, 1975, Plaintiffs served Defendants with a notice of default for non-payment of the December 10, 1975 payment. The parties continued to enable Defendants to try to complete payments on the agreement until May 22, 1976, when Plaintiffs again served Defendants with a notice of default, citing non-payment of both the December 10, 1975 and February 10, 1976 $89,500 payments, followed by a "notice of forfeiture" on July 1, 1976. On September 3, 1976 this action was filed by Plaintiffs to remove Defendants from the property and clear Plaintiffs title thereto.

On January 20, 1977, pursuant to stipulation, an order was entered by the Court declaring the sale contract forfeited and clear title to the farm to be quieted in the Plaintiffs.

Evidence as to the discussions leading up to such stipulation is in irreconcileable conflict. Plaintiffs contend that the stipulation was prompted by Defendant's inability to get financing to meet its payments on the purchase and Plaintiffs necessity to pay on their purchase agreements and to perfect water rights on the undeveloped acres by getting them irrigated. They claim an oral agreement was made that they would obtain a loan to pay off their prior purchase agreements and develope the unirrigated acres, receive compensation for their work to do that, and that Defendants, to protect their interests, were to have a "first right of refusal" before there could be a subsequent sale of the farm by Plaintiffs to another. A written agreement stating the details of Plaintiffs understanding of such oral negotiations was prepared but never executed by Defendants (Defendants Ex. 43).

Although Defendants do not agree with Plaintiffs' version of the oral negotiations, it is uncontradicted that Defendant did not sign the proposed written agreement and did not return it or ever advise Plaintiffs that it was not acceptable. There is furthermore no dispute but that on June 13, 1977 Plaintiffs advised Defendants that they had an offer to purchase the farm and the price offered, and that Defendants had 20 days to meet the offer.

Plaintiffs urge that Defendant is estopped to deny that it agreed to the right of first refusal by its silent acquiescence (and apparently that it is therefore estopped to claim any of its payments constituted an unconscionable penalty which it is entitled to recover back). I resolve this question in Defendant's favor, however, in view of the clear inclusion in Ex. 43, prepared by Plaintiffs, that Defendant would dismiss its counterclaim only *after* the agreement was executed; and my conclusion that the purported first right of refusal was not fully communicated to Defendants as required by *Gyurkey v. Babler*, 651 P.2d 928, 931.

The Defendant contends that the "liquidated damages" provision in the contract is a penalty, void and unenforceable.

The preponderance of the evidence in this case however establishes that the payments made by Defendants and retained by Plaintiffs bear a reasonable relationship to actual damages incurred by Plaintiffs from Defendant's breach, and do not constitute a penalty.

The best calculation of "rental value" for the 2,140 acres of developed land would be, as set out in Defendant's brief, $401,252 based on yields from those acres and average prices. This would allow no rental value whatever for the remaining 1700 acres, which Defendants also had possession of in 1975 and 1976. In order to calculate a "rental value" for the undeveloped land, I see considerable merit in Plaintiffs "return on investment" or "return on equity" theories. The Plaintiffs' computation of $447,518.51 would appear to reasonably approximate rental value of the entire farm. This would leave a rental value of $46,266.51 (447,518.51 less 401,252.00) allocable to the undeveloped land over the period of the contract. It appears reasonable and Defendants did not submit any evidence whatever relative to rental value of the undeveloped land.

Under *Anderson v. Michel*, it appears that from such $447,518.51 rental value should be deducted the $221,753.24 in interest which Defendants did pay, leaving $225,765.27 of net rental value.

Under *Melton v. Omar*, any decrease in value of the property during Defendant's possession should be added to the rental value to compute Plaintiffs' damages. Any increase in value should logically then be deducted. After considering the testimony of the appraisers, the evidence relative to the two sales of the property and of other property in the area at about the time pertinent, I conclude that the totality of the evidence shows that there was no significant increase or decrease in the value of the property between the time Defendants purchased *it in July of 1974* and the ultimate default and forfeiture *in July of 1976.*

The other expenses incurred by Plaintiffs after Defendant's default were intertwined with the resale of the property and must accordingly be considered therewith.

The evidence shows that the Plaintiffs were not unjustly enriched upon the second sale of the farm. Although it was sold at a higher price than Defendants contract price, Plaintiffs made substantial investments of time and money to improve it. Plaintiffs witness, James Watt, a C.P.A. familiar with Plaintiffs' accounts and expenditures, explained how there was actually a loss on the subsequent sale.

Accordingly, except for the $5,000 claimed for lost advertising, the $310,648.00 in expenses claimed by Plaintiffs was reasonably established by a preponderance of the evidence. When this $305,648.00 is added to the $225,765.27 in rental value, it would appear that actual damages were $531,413.27, amounting to more than the $510,000 down payment made by Defendants.

As pointed out by Plaintiffs, even if the down payment were as much as 12.7% more than actual damages, our Supreme Court has held it could be reasonable.

Therefore, I conclude that Defendant has failed to establish, by a preponderance of the evidence, that under the facts here the payments it made on the contract were so disproportionate to the actual damages incurred by Plaintiffs as a result of Defendant's breach as to be exorbitant amounting to an unconscionable penalty.

It was established by the evidence that, outside of the contract involved here, Defendants purchased personal property consisting of mobile homes and furniture from Plaintiffs and paid therefor $20,907.00 in principal and $2,453.85 in interest. Plaintiffs retained no title or lien interest in the personal property. The evidence indicates Plaintiffs also took possession of such property when they re-took possession of the land in January 1977, although neither the stipulation or court order covered such personal property. Although I do not feel that Defendant is entitled to credit on the real estate contract for money paid for the personal property, neither should Plaintiffs retain such personal property without fair compensation therefor to Defendant.

Counsel may accordingly draft Findings, Conclusions and Judgment consistent with this opinion for my consideration.

DATED this 22nd day of February, 1983, NUNC PRO TUNC.

/s/ Robert M. Rowett
ROBERT M. ROWETT
DISTRICT JUDGE

## ON DENIAL OF PETITION FOR REHEARING

BISTLINE, Justice, dissenting.

### PREFACE

There is likely little to be gained by re-plowing the same ground. Nevertheless, I feel constrained to make a final effort at pointing out exactly where the majority is taking the law and how erroneously it gets there. The majority today is making a drastic change in the law of vendor-vendee.

Time will soon demonstrate that it is bad law which will lead to an increase in litigation and produce unjust results not ever contemplated by litigating parties as evidenced by their written contracts.

As I have on many occasions conceded, any day that three members of this Court want to decide a case a certain way (result-oriented), irrespective of existing law or by making new law, their will will be done. If the majority today were to *forthrightly* declare themselves to be making new law, I would be less disturbed. But, the majority makes no such forthright admission, and on the contrary would have it believed that a bit of dictum found in *Anderson,* and a dissected excerpt from an ancient A.L.R. annotation form a backbone for the majority holding. Although my previous effort at exposing this dissemblance did not provoke the slightest response, I am not dissuaded from one last writing which is narrowed down to the dictum, and to the A.L.R. excerpt.

### What the law in Idaho has been until *Clampitt.*

Since *Graves v. Cupic,* 75 Idaho 451, 272 P.2d 1020 (1954), was announced, it and its progeny have stood for the proposition that a vendee whose contract has been terminated by the vendor is, under a theory of restitution based on unjust enrichment, entitled to recover back from the vendor that amount by which the payments made exceed the vendor's actual damages caused by the vendee's breach—provided, however, that the difference between the same is so disproportionate that the provision whereby the vendor would be allowed to retain all monies paid by vendee (usually under the terminology of liquidated damages) is held to be a penalty.

The rules for making that determination have been many times well stated over more than 30 years. The vendor is entitled to set off against vendee's payments that amount found to be reasonable rental for the vendee's occupation of the premises. There may be special damages which also afford the vendor a set-off. Always a consideration is that on the vendee's surrender of the premises, often including personalty,

the same are found to be of less value than at the contract's inception. In *Anderson v. Michel*, 88 Idaho 228, 239, 398 P.2d 228, 234 (1965), for instance, the trial court found that the fair market value of the realty when it was turned back was $31,140 less than when the vendees took possession. 88 Idaho at 236, 398 P.2d at 232. In no case until today, *Clampitt*, has the cost of a resale of the repossessed premises ever been considered as an element of a vendee's damages. Nor was it in *Anderson*. The trial judge who decided that case was explicit:

> "Actual damages here sustained by the plaintiffs do bear a reasonable relationship to the sums paid by the defendants on the contract, and are not exorbitant or unconscionable to the extent that they could be considered a penalty under the provisions of Idaho law, considering the magnitude of the transaction." *Anderson, supra*, at 236, 398 P.2d at 232.

The Supreme Court, after making minor adjustments, came to the same conclusion. In agreeing with the district judge, it used *practically* the identical language of the district judge:

> Having in mind the costs and expenses of this litigation, the possible expense of a resale of the property, and the magnitude of the transaction, we conclude that the amount retained by plaintiffs as liquidated damages bears a reasonable relation to the actual damages sustained and is not so exorbitant and unconscionable as to constitute a penalty. Cf. *Graves v. Cupic*, 75 Idaho 451, 272 P.2d 1020 (1954). *Anderson, supra*, at 239, 398 P.2d at 235.

"Practically" I say, because of the insertion of the phrase, "the possible expenses of a resale of the property." The district judge did not use that language. A resort to the file in the clerk's office discloses that no contention was ever made that "possible expenses of a resale" was ever pleaded or claimed as an element to go into the equation. The trial court in a lengthy and comprehensive memorandum decision and in detailed findings of fact and conclusions of law, never touched on that subject—simply because it. had never been held to be a

proper element of consideration. A vendor who has repossessed might decide to sell again, and he might not. He might sell again after five years, after ten years, or immediately—but in any event, *no* court until today has actually speculated that "possible expenses of a resale" are to be taken into account. For absolute certain, *Graves*, the only case cited in *Anderson* for the novel "possibility of resale" doctrine made not the slightest intimation that such was there involved. Nor was it involved, as a close perusal of that file discloses.

If one member of the majority would add to its opinion an explanation reasoning why the statement from *Anderson* is not sheer *obiter dictum*, I would withdraw the dissent.

If one member of the majority would likewise add to that some valid reasoning which is even halfway convincing that the A.L.R. excerpt has any application to this case, I would withdraw the dissent.

If one member of the majority would likewise add to its opinion something from the record which shows that those contracting parties at the time of contracting both contemplated the kind of special damages which here were claimed by the vendors, awarded by the trial court, and sustained by a majority of this Court, I would withdraw the dissent. Presently there is nothing to behold but the majority's *ipse dixit* of which mention was earlier made: "It is *possible* that these additional damages could include, in the proper case with proper findings of fact, the costs of refinancing or reselling the property." For years has the profession labored under the mistaken belief that a party claiming special damages had to show that such *were* actually or implicitly within the contemplation of the parties at the inception of the contract. 22 Am.Jur.2d *Damages* § 56 (1965); also §§ 57, 58, 59, and 60. The law as therein reviewed was relied upon and accepted by this Court in the leading case of *Brooks v. Jensen*, 75 Idaho 201, 218, 270 P.2d 425, 442 (1954):

> Conceding, without deciding, appellants might in rescission be entitled to damages in addition to return of pay-

ments and value of improvements, *Houchin v. Braham Invest. Co.,* 202 Minn. 540, 279 N.W. 370, 120 A.L.R. 1154; see also *Stewart v. Salisbury Realty & Ins. Co.,* 159 N.C. 230, 74 S.E. 736, and *Vicker v. O'Connor,* 218 Wis. 216, 260 N.W. 426; *appellants' expenses for trips from and loss in the sale of their property in Montana, though necessary to secure funds to make the purchase herein, are too remote and were not sufficiently within the contemplation of the parties to be recoverable.* 25 C.J.S., Damages, §§ 24, 25, pp. 481, 488; 15 Am.Jur. 451, § 52 and 471, § 66. (Emphasis added.)

Although the author of the majority opinion avoids going beyond declaring what "additional damages could include in the proper case," implicit in the majority opinion is the premise that the trial judge did *find* the special damages in question to have been within the rule of *Hadley v. Baxendale,* 9 Exch 341, 156 Eng Reprint 145 (1854), and *Brooks.* He did not do so. Rather, he found only the special damages actually sustained by vendors—which were said to be found *intertwined* —not found to have been contemplated.

The only indication in the record as to what in the way of damages was within the contemplation of the parties at the inception is the contract itself, and in particular in paragraphs 8, 9, and 16 of that agreement. The agreement, minus signatures and personal property descriptions, is appended. Paragraphs 8 and 9 make the vendee liable for waste and failure to maintain. Paragraph 16 declares the vendor's remedies for uncured default:

If the buyer fails to correct said default within said thirty-day period, then the seller may at its option and without further notice declare the whole unpaid balance of said purchase price immediately due and payable and proceed at once to recover the same or declare a forfeiture of all of the rights of the buyer under this agreement and of all of its interest in and to said property, *retaining all sums theretofore paid* by the buyer under the terms hereof *as the reasonable value for the use and occupation of said property* during the time that possession of the same is retained by the buyer hereunder, or the seller may at its option bring an action in equity or at law for specific performance with damages. (Emphasis added.)

Of interest, paragraph 11 displays that it was within the contemplation of the parties that the vendors might fail to make payments on their underlying contracts—in which event "then for the purpose of protecting its equity in said property the buyer may at its option make any payment deemed by it to be necessary to protect its rights under this contract and any such payment made by the buyer shall be credited upon the purchase price to be paid to the seller, either of principal or interest, under the terms of this agreement." Nothing in the contract, nor in the record, justifies the majority in finding that which the trial court did not find—that the special damages here charged against the vendees were within the contemplation of the parties at the inception of the contract.

In the four months which have gone by since our opinions were released on May 6, 1985, not one member of the majority has supplied one word to allay the concerns which I then expressed. If a member of this Court cannot obtain any response whatever to a question raised to an opinion, what may the poor practitioner expect?

## AGREEMENT FOR SALE OF FARMING PROPERTY

### SUBJECT:

### ELMORE COUNTY FARMING LAND AND ALL WATER RIGHTS AND IRRIGATION EQUIPMENT

### PARTIES:

DELBERT CLAMPITT and DELSIE CLAMPITT, husband and wife, and GARY A. CLAMPITT a single man, Sellers,

and

A.M.R. CORPORATION, an Idaho corporation, Buyer.

SALES AGREEMENT, made this 11th day of July, 1974, between DELBERT

CLAMPITT and DELSIE CLAMPITT, husband and wife, and GARY A. CLAMPITT, a single man, whose address is Box 106, Hammett, Idaho, hereinafter designated in the singular and by masculine gender as the seller, and A.M.R. CORPORATION, an Idaho corporation, whose address is 589 North Water Avenue, Idaho Falls, Idaho 83601,. hereinafter designated as the buyer;

WITNESSETH: That for and in consideration of the sum of Two Million Three Hundred Thousand Dollars, to be paid as hereinafter specified, and in consideration of the covenants and agreements herein contained, the seller hereby agrees to sell and convey and the buyer hereby agrees to purchase the following described real and personal property located in the County of Elmore, State of Idaho, and particularly described as follows:

REAL PROPERTY, described as follows:
PARCEL NO. 1
All of Section Twenty-seven; all of Section Thirty; All of Section Thirty-one; All of Section Thirty-two and all of Section Thirty-three, in Township Four South, Range Seven East, Boise Meridian;

The East Half of Section Five, Township Five South, Range Seven East, Boise Meridian.

That portion of the Northwest Quarter of the Southwest Quarter of Section Twenty-one, Township Five South, Range Seven East, Boise Meridian, bounded as follows:

Commencing at the Northwest corner of the Northwest Quarter of the Southwest Quarter of Section Twenty-one, Township Five South, Range Seven East, Boise Meridian; thence South 89°54' East along the North line of the Northwest Quarter of the Southwest Quarter of said Section Twenty-one a distance of 80.4 feet to the True Point of Beginning; thence continuing South 89°54' East 200.8 feet; thence South 31°49' West 267.5 feet; thence South 3°00' East 409.8 feet; thence South 22°36' East 328.3 feet; thence South 36°19' East 473.2 feet to a point on the South line of the Northwest Quarter of the Southwest Quarter of said Section Twenty-one; thence North 89°54' West along the South line of the Northwest Quarter of the Southwest Quarter of said Section Twenty-one a distance of 112.2 feet; thence North 44°50' West 221.5 feet; thence North 27°17' West 444.2 feet; thence North 13°22' West 121.25 feet; thence North 4°08' West 210.2 feet; thence North 0°39' East 287.1 feet; thence North 9°08' East 156.0 feet back to the True Point of Beginning.

PARCEL NO. 2
The West Half of Section Five, the East Half of Section Six, the Northeast Quarter of Section Seven and the Northwest Quarter of Section Eight, all in Township Five South, Range Seven East, Boise Meridian, hereinafter referred to as the "Groefsema Property".

PARCEL NO. 3 .
The new pump system already installed for the irrigation of the land described in Parcel No. 1 above, including but not limited to the following:

At the River Station, four 600 hp U.S. Electric Company motors and Johnson pumps type 519–716, together with five Cook electric panels;

At the Relift Station, two 300 hp Vinson Carter Electric Company motors and Johnson pumps, together with three Cook electric panels; and one Kellogg American air compressor and panel.

At the Pressure Station, two 500 hp U.S. Electric Company motors and Johnson pumps type J519–718, together with Cook electric panels;

At the Deep Well, one 200 hp deep well pump and U.S. motor, Serial No. 1376334, together with panel.

PARCEL NO. 4
All hand lines for irrigation, more particularly described upon the schedule attached hereto marked "Exhibit A" and by this reference made a part hereof.

PARCEL NO. 5
All pipe of whatever nature installed underground for the purpose of transmit-

ting irrigation water from the point of diversion to place of use.

PARCEL NO. 6

All canals and ditches constructed for transporting irrigation water from Snake River to place of use or from pipelines to place of use.

PARCEL NO. 7

All pumps as listed and described upon the schedule attached hereto, marked "Exhibit B" and by this reference made a part hereof.

ALL TOGETHER with all rights of way for pumping station or water transmission and together with all water permits issued for the use of irrigation water upon any of the real property above described, and together with the tenements, hereditaments and appurtenances thereunto belonging or in anywise appertaining, but all subject to patent reservations and easements visible or of record.

1. PURCHASE PRICE. The buyer, in consideration of the premises, agrees to pay to the seller for said real and personal property the said sum of Two Million Three Hundred Thousand Dollars, payable at the times and in amounts as follows:

The sum of $10,000.00 prior or at the time of the execution of this agreement, the receipt of which is hereby acknowledged by the seller;

The sum of $250,000.00 on or before the 10th day of December, 1974;

The sum of $250,000.00 on or before the 10th day of February, 1975;

The sum of $89,500.00 on or before the 10th day of December, 1975;

The sum of $89,500.00 on or before the 10th day of February, 1976;

The sum of $89,500.00 on or before the 10th day of December, 1976, and a like sum on or before the 10th day of February and 10th day of December of each and every year thereafter until said purchase price, together with the interest hereinafter mentioned, has been paid in full.

2. INTEREST. The deferred balance of said purchase price shall bear interest from the date of this agreement until paid at the rate of nine per cent per annum. The first payment of interest shall be made on or before the 10th day of December, 1974, at the time of the payment of $250,-000.00 upon the principal sum, and the interest shall be paid thereafter upon the 10th day of February and upon the 10th day of December of each year, simultaneously with the payment of the installment upon the principal sum in accordance with the schedule set forth above.

3. RIGHT OF PREPAYMENT. The buyer may at its option pay all or any part of said purchase price on or before the due date thereof, without penalty, and interest shall be charged only upon the principal balance remaining from time to time unpaid.

4. ALLOCATION OF PURCHASE PRICE. It is understood and agreed that the total purchase price of Two Million Three Hundred Thousand Dollars is allocated to and being paid for each parcel of property as set forth, on the schedule attached hereto, marked "Exhibit C" and by this reference made a part hereof.

5. PLACE OF PAYMENT. All of said deferred payments shall be paid by the buyer to the seller at the Idaho First National Bank in Mountain Home, Idaho, which said bank is designated as escrow holder under the provisions of this agreement.

6. TAXES AND WATER PUMPING CHARGES. The seller agrees to pay and discharge all unpaid taxes and water pumping and maintenance charges levied or assessed against said property or incurred in connection therewith for the year 1974 and all prior years. The buyer agrees to pay all taxes, water pumping charges and maintenance charges levied or assessed against said property or incurred in connection therewith for the year 1975 and all subsequent years. If the buyer fails to pay the taxes or assessments herein agreed by it to be paid before the same go delinquent, the seller may declare the buyer in default

under the terms of this agreement, after notice as hereinafter mentioned, or may at his option make any payment deemed by him to be necessary to protect the title to the property herein sold, and any such payment made by the seller shall be considered as a portion of the unpaid purchase price and shall bear interest at the rate of nine per cent per annum from the date of payment until repaid by the buyer and the buyer agrees to repay the same upon demand. It is understood that the seller has entered into a service contract with Idaho Power Company for the purpose of obtaining electric power with which to operate the electric motors and pumps for irrigation purposes and that under the terms of said contract the seller has guaranteed to pay to Idaho Power Company a minimum annual payment. The buyer hereby assumes the seller's obligation under said service agreement, commencing January 1, 1975, and agrees to pay the minimum annual payment as required by said contract for the year 1975 and each year thereafter, together with such additional charges, if any, as are required by said contract, and the buyer agrees to indemnify and hold the seller harmless from all further liability under said Idaho Power Company electric service contract. It is understood that the money deposit made by the seller with Idaho Power Company for the purpose of guaranteeing payment for electric service for the year 1974 shall belong to the seller and any refund in connection with such deposit shall be paid to the seller. Any deposit required by Idaho Power Company for 1975 and thereafter guaranteeing payment shall be paid by the buyer.

7. POSSESSION. It is understood that the seller now has crops planted upon a portion of the real property above described; that the seller retains the title to said crops and shall have the right to continue in possession of said crop lands and the irrigation system for the purpose of maturing and harvesting the 1974 crops and removing the same from said real property. Possession of the irrigation system and equipment and the lands planted with crops shall not be delivered to the buyer until after the seller has matured, harvested and removed said crops during the year 1974, after which possession of the crop land and irrigation system shall be delivered to the buyer, it being understood that the operating units, consisting of motors and pumps, used in connection with the irrigation system will be turned over to the buyer in operating condition. The buyer shall be entitled to the possession of any part of said real property not planted with crops immediately upon the execution of this agreement and may continue in possession of said property so long as the buyer complies with the terms of this agreement.

8. WASTE. Any buildings or permanent improvements placed upon said real property by the buyer shall become a part of said property and shall not be removed. The buyer covenants to commit no waste upon said premises and to permit no waste to be committed by others and further covenants to keep said property free and clear of all mechanics' liens, materialmen's liens and all other liens of every kind or nature whatsoever, save and except current taxes and the liens herein mentioned.

9. CARE OF PROPERTY. After receipt of possession of the same, the buyer agrees to keep up and maintain all of said real and personal property in as good a condition as the same was at the time of the delivery of said real and personal property, or may hereafter be placed, natural wear and tear from the ordinary use thereof excepted.

10. NO WARRANTIES. The buyer acknowledges that it has inspected the real and personal property hereby agreed to be sold knows the condition of the same and accepts said property in its present condition and acknowledges that it is relying upon the judgment of its own officers as to the condition and value of said property and acknowledges that the seller has made no representations concerning said property, except the representations contained in this agreement.

11. EXISTING CONTRACT OBLIGATIONS. The buyer understands that

the seller is purchasing the real property described as Parcel No. 1 above, from Intermountain Gas Company, a corporation, under a contract in writing dated August 24, 1973, which contract is payable over a period of years, with the buyer having the right to prepay any part of the purchase price at any time. The buyer further understands that under the terms of the Intermountain Gas Company sale contract the seller Clampitt has assumed and agreed to pay State of Idaho Land Sale Certificate No. 24140 covering the East Half of Section Twenty-seven, Township Four South, Range Seven East, Boise Meridian; State of Idaho Land Sale Certificate No. 24141 covering the West Half of Section Twenty-seven, Township Four South, Range Seven East, Boise Meridian; State of Idaho Land Sale Certificate No. 24134 covering the East Half of Section Thirty-two, Township Four South, Range Seven East, Boise Meridian; State of Land Sale Certificate No. 24135 covering the West Half of Section Thirty-two, Township Four South, Range Seven East, Boise Meridian; State of Idaho Land Sale Certificate No. 24138 covering the East Half of Section Thirty-three, Township Four South, Range Seven East, Boise Meridian; State of Idaho Land Sale Certificate No. 24139, covering the West Half of Section Thirty-three, Township Four South, Range Seven East, Boise Meridian; State of Idaho Land Sale Certificate No. 24136 covering the East Half of Section Thirty-one, Township Four South, Range Seven East, Boise Meridian, and State Land Sale Certificate No. 24137 covering the East Half of the West Half and Lots One to Four, inclusive, of Section Thirty-one, Township Four South, Range Seven East, Boise Meridian. The buyer further understands that the seller is purchasing the real property described in Parcel No. 2 above from Christine Groefsema et al under a sale contract in writing dated March 1, 1974. It is agreed that it shall be the obligation of the seller to continue to make the payment falling due upon the land sale certificates and the sale contract above-described, or to see that the same are paid, as and when the same become due and pay-

able and the seller agrees to pay and discharge the same in full prior to the time the buyer completes payment of the purchase price required under the terms of this contract, so that the seller will then be in a position to convey marketable title to all of said property to the buyer in accordance with the provisions of this agreement. If the seller fails to pay any of the installments required under any of said purchase contracts or land sale certificates at the time the same become due and before the same become delinquent, then for the purpose of protecting its equity in said property the buyer may at its option make any payment deemed by it to be necessary to protect its rights under this contract and any such payment made by the buyer shall be credited upon the purchase price to be paid to the seller, either of principal or interest, under the terms of this agreement. Such credit shall be entered upon the records of the escrow holder hereinafter mentioned upon delivery by the buyer to the escrow holder of a duly executed receipt showing such payment to have been made by the buyer for or in behalf of the seller.

12. ESCROW. The seller agrees at the time of the execution of this agreement to place in escrow with the Idaho First National Bank at Mountain Home, Idaho, a warranty deed in standard form executed by the seller and conveying to the buyer marketable title to the real property above-described, subject to the reservations herein contained, together with a bill of sale in standard form conveying to the buyer marketable title to the personal property above described, subject to the provisions of this agreement. Said escrow holder is hereby authorized and directed to deliver said instruments to the buyer upon its depositing in said bank to the credit of the seller the deferred payments of purchase price above mentioned with interest, at the times specified above, and upon a compliance of the other terms and conditions hereof; otherwise, said escrowed instruments shall be returned to the seller. An executed copy of this agreement shall be deposited with

said bank as escrow holder and shall be directions and instructions to it with reference to the terms and conditions hereof.

13. ESCROW FEES. All escrow fees of said bank shall be paid one-half by the seller and one-half by the buyer.

14. WATER PERMITS. It is understood that certain applications have been made to the Idaho Department of Water Administration for the appropriation of water for use in irrigating the land above described, and that it will be necessary in the future to file with the Idaho Department of Water Administration final proof that said water has been put to beneficial use, in order to obtain a permanent license for the use of said water. A list of said permits showing the permit number and the date for submission of final proof of beneficial use is attached hereto, marked "Exhibit D" and by this reference made a part hereof. It is understood that it shall be the obligation of the buyer to submit proof of beneficial use of said water at the time the same becomes due and the seller agrees upon demand of the buyer to assign to the buyer any water permit for which proof of beneficial use is to be made.

15. SECURITY INTEREST. It is understood that the seller retains a security interest in the personal property hereby agreed to be sold and that title to said personal property shall be and remain in the seller until said purchase, with the interest, has been paid in full. As evidence of such lien and upon request of the seller, the buyer agrees to execute and deliver to the seller financing statements under the Uniform Commercial Code of the State of Idaho, designated as UCC–1, to be filed for record as evidence of the seller's continuing security interest in said personal property. In the event the buyer fails to comply with the terms of this agreement and it becomes necessary for the seller to foreclose its security interest, then the seller may exercise its rights either by foreclosure in accordance with the provisions of this agreement or by any method prescribed by the Uniform Commercial Code of the State of Idaho.

16. REMEDIES FOR DEFAULT. Time is agreed to be of the essence of said payments and of this agreement and of any subsequent agreement in relation hereto and full performance by the buyer of all its obligations hereunder is and shall be a condition precedent to its right to a conveyance hereunder. In the event the buyer fails to comply with any of the terms hereof, then the seller, through said escrow holder, shall first give the buyer thirty days' notice in writing specifying wherein the buyer has failed to comply with the terms hereof and which said notice shall be delivered to the buyer personally or may be sent to it by registered or certified mail, addressed to the buyer at its last post office address as furnished to the escrow holder. If sent by mail, said notice shall be deemed served upon the buyer upon the date it is deposited in the United States mails with postage prepaid, certified or registered and addressed as above mentioned. If the buyer fails to correct said default within said thirty-day period, then the seller may at its option and without further notice declare the whole unpaid balance of said purchase price immediately due and payable and proceed at once to recover the same or declare a forfeiture of all of the rights of the buyer under this agreement and of all of its interest in and to said property, retaining all sums theretofore paid by the buyer under the terms hereof as the reasonable value for the use and occupation of said property during the time that possession of the same is retained by the buyer hereunder, or the seller may at its option bring an action in equity or at law for specific performance with damages.

17. ATTORNEY'S FEES. In the event it becomes necessary for either of the parties hereto to place this agreement in the hands of an attorney for enforcement of their rights hereunder for the default of the other party or to institute suit for enforcement of their rights hereunder, then the defaulting party, or the successful party in case of suit, shall be entitled to recover reasonable attorney's fees from the oth-

er party, in addition to the other damages allowed by law.

18. HEIRS AND ASSIGNS. The terms and conditions of this agreement shall extend to and be binding upon the heirs, administrators, executors and assigns of the respective parties hereto.

IN WITNESS WHEREOF, the said parties have hereunto set their hands the day and year in this agreement first above written.

/s/ Delbert Clampitt
Delbert Clampitt
/s/ Delsie Clampitt
Delsie Clampitt
/s/ Gary A. Clampitt
Gary A. Clampitt,
Sellers,
A.M.R. CORPORATION, an Idaho corporation,
By ——————————————
Buyer.